## The Grand Rapids and Bay City Railroad Company v. Stewart A. Van Dusen.

*Contract construed: Grading: Embankment: Excavation: Measurement.* The contract in this case, for grading and preparing for ties the bed of a railroad, is held to contemplate, as a general rule, that the road-bed will be an embankment made by earth thrown up from ditches on either side; but that the "cuttings on the line of the road" referred to, are not these ditches, but the cuttings necessary in places where the natural surface was higher than the level of the road, and to be brought to grade, required to be cut down; and that all earth thrown into embankments, whether taken from the ditches or from cuttings on the line, should be measured in the embankment, and not as excavation, according to the space it occupied before removed, and that all the earth thrown into spoil banks was to be measured as excavation; and a ruling that the contractors were to be allowed for all shrinkage of the earth, arising from its being thrown into embankments, and measuring less there than it did where it was taken from, is held erroneous.

*Grading: Embankment: Evidence.* A great fire having swept over the line of the road, after the survey and before the contract was made, and burned away the soil so that it required more earth by way of fills and embankment than was shown by the profile and table of cuts and fills, made by the engineer before the fire, it was not error to permit the jury to take this fact into account in determining the amount of work done under the contract.

*Contract construed.* A provision of the contract that the contractors shall "proceed with such diligence and with such force of laborers as the executive committee of said company may direct, to perform the work," etc., is held to be subordinate to, and qualified by the provision directly following it, requiring the work to be completed by a day named, and to be intended to enable the company to compel completion by the day specified.

*Contracts: Breaches: Default in payment: Abandonment: Damages.* Continued and repeated defaults in payment according to the provisions of the contract, are held to have justified the contractors in abandoning the work be-

fore its completion; and to entitle them to recover as damages what the uncompleted portion of the work would amount to, at the contract price, beyond the cost to them of completing it.

*Delay: Default: Extra compensation: Increased cost of work.* But failure to pay monthly, as agreed, would not of itself, and in the absence of any showing that any delay was authorized by the company, entitle the contractors to recover extra compensation for the labor performed, on account of the delay occasioned by such default in payment, and the consequent increased cost of the work.

*Agency: Authority: Directions.* Where, however, such delay was occasioned by a decrease of the force of men employed, at the request of the treasurer of the company, who was one of the committee that had executed the contract on its behalf, and the only one of them who had given any personal attention to the work or directions to the contractors, and upon his statement that the company were unable to collect money fast enough to pay according to the contract, the contractors would have a right to assume, in the absence of any notice to the contrary, that he was authorized to give such directions, and they were justified in acting accordingly.

*Heard May 12.    Decided July 8.*

Error to Bay Circuit.

*Marston, Hatch & Cooley,* for plaintiff in error.

*Holmes & Stoddard,* for defendant in error.

CHRISTIANCY, J.

This was an action of assumpsit, brought by Van Dusen against the railroad company upon a contract for grading and preparing for ties about fourteen miles of road-bed (including clearing, grubbing, building culverts, bridges, cattle-guards, and the necessary excavations, embankment and filling), and upon the common counts.

The contract is dated December 7th, 1871; was executed by three (of the five) members of the executive com mittee of the company, and on its behalf (no question being raised as to their authority), and by the plaintiff Van Dusen, and John F. Willey, contractors, Willey having, after the work was commenced, assigned all his rights under the contract to Van Dusen.

As a copy of the contract is given below,* I shall notice

* "This agreement, made this 7th day of December, A. D. 1871, by and between the Grand Rapids and Bay City Railroad Company, party of the first part, and John F. Willey and S. A. Van Dusen, both of Bay City, parties of the second part, *witnesseth,* that, whereas,

here only such parts of it as bear upon the questions raised and relied upon.

The price for the *grading* was twenty-eight cents per cubic yard. But as the number of yards would be different, according to the particular mode of measurement, and would depend upon whether the earth should be measured after it should be thrown into the embankment ( where this was done), or whether the hole or excavation from which it was taken should be measured, the specifications, which are made a part of the contract, for the purpose of removing all doubt upon this point expressly declare: " The road-bed to be formed by the earth thrown from the ditches each side, in all cases when the same can be done, unless otherwise ordered by the engineer or superintendent in charge. Where there are cuttings on the line of the road, the contents of the same to be removed into the adjacent hollows to form

the said first party proposes to construct a railroad, to be known as the Grand Rapids and Bay City Railroad, and have surveyed and located that part of the eastern division thereof commencing at station one hundred and two and extending to and beyond station eight hundred and two, and has agreed to let certain portions of said work to said second parties as is hereinafter specified. *It is therefore agreed* between said parties as follows : Said parties of the second part agree to proceed with such diligence, and with such force of laborers, as the executive committee of said company (party of the first part) may direct, to perform the work herein specified, and to complete the same according to the specifications as furnished by the engineer of said railroad company, and to the full satisfaction and acceptance of said engineer and the executive committee, on or before the 1st day August, 1872, and the said specifications which are hereto attached shall be held and considered as part of this contract.

" The work to be done and materials to be furnished by said parties of the second part under this contract are the following, viz. : chopping, clearing, grubbing, building of culverts, cattle-guards, and bridges, and earth excavations, which work the said second parties agree to do in such manner as to prepare the road-bed for the ties, to the acceptance and satisfaction of the said engineer and executive committee, as aforesaid, from station one hundred and two to station eight hundred and two aforesaid, for the price hereinafter specified; said parties of the first part agree to pay for said work and materials the following prices, viz. :

*First.* For chopping, clearing and grubbing (work actually done only to be measured), four hundred and forty-seven dollars per mile for timber land.

*Second.* For grubbing (to be measured in like manner), not in timber land, allowance to be made by engineer.

*Third.* For grading, twenty-eight cents per cubic yard.

29 MICH.—55.

embankment, unless otherwise directed, all earth removed to-
a distance not to exceed six hundred feet, to be considered
as part of the contract, and nothing extra to be allowed.
When the distance exceeds six hundred feet, one per cent.
per cubic yard per one hundred feet for the distance the
same is carried will be allowed for all earth that is carried
to a greater distance than the standard six hundred feet.

"*When. the excavation is used in the embankment,* the-
embankment only will be measured. When the excavation
is thrown into spoil banks," [in other words, thrown away,
or not used in embankment ] "the excavation will be meas-
ured."

The court in his charge construed this contract as pre-
scribing precisely the same rule of measurement of earth
taken from the ditches along the sides of the road, when
that earth was thrown into embankment, and that taken-

*Fourth.* For bridges, thirty-four dollars per thousand, board meas-
ure.

*Fifth.* For culverts and cattle guards, twenty-three dollars per
thousand, board measure.

"Between the first and tenth of each month estimates of work
done the preceding month shall be made by the engineer of said com-
pany, and on the 13th of each month (unless that day should fall on
Sunday, then on the 12th), payment shall be made to the amount of
ninety per cent. of such estimate ; the ten per cent. shall be retained
until the work shall be fully completed and accepted by said engineer
and executive committee, and in case said parties of the second part
shall fail to perform this contract, the said ten per cent. shall be
retained as liquidated and settled damages for the breach of this con-
tract.

"It is further agreed that all questions that may arise between the-
parties hereto under this contract, shall be referred to said engineer
for adjustment, and his award shall be final and conclusively binding
on both parties. Said parties of the second part further agree to give
bond to said first party, with good and sufficient sureties, to be ap-
proved by the executive committee of said railroad company, in the
sum of ten thousand dollars, conditioned for the faithful, prompt and
proper performance of this contract, and that they will save the said
first party harmless from all liability for the labor done and materials
and supplies furnished for said work by the employes and others con-
tracting with said second parties beyond the amount that may be due
from said first party to said second party, and to this end, and for a
further security to said first party, it is agreed that the provisions of
act No. 100 of the session laws of 1871 shall be taken to be a part
of this contract. It is further agreed that no spirituous or intoxicat-
ing liquors shall be furnished by said second parties to, nor allowed
to be used by the laborers on the line of the road. In case of any

from cuttings in the line of the road, thrown out as spoil, and not used in embankment; and laid it down as the law of the contract that excavation was to be alike measured in both, instead of the embankment into which the earth was placed in the process of grading the road. To this extent the meaning of the charge is clear enough; but it seems to me to go still further, and in effect to hold that, as a rule applicable to the measurement of all earth thrown into or used in embankment, whether from ditches or from cuttings in the line of the road, it shall be as excavation, by measuring the space whence it came, and not the earth in the bank; and that the clause in reference to measurement in the embankment was only inserted as a kind of necessity, to avoid measuring the same earth twice, in cases where a part of it had been thrown out as spoil, and a part used in the embankment, and where the embankment was in part made from the ditches and part from the cuttings in the line of the road; and that after all, in some way, or for some reason, which is not to our minds very clear, the rule of measurement adopted as a principle for all earth thrown into embankments was that the amount was to be ascertained by measuring the space from which the earth was taken, in short, the excavation. If this is not his meaning, it is difficult to discover from what he draws the conclusion which he proceeds to draw, that the plaintiff

change of location of the line of said road, this contract shall apply to the line as changed, and no damages shall be claimed by said second parties by reason of such change.

"It is further agreed that when the line of said road shall be located and surveyed eastward from station one hundred and two toward or to the Saginaw river, said second parties shall have the option to prepare the same for the ties, under the provisions of this contract, and in such case this contract and the bond given in pursuance thereof shall be held to apply to said portion east of station one hundred and two, as well as to that west thereof, in the same manner and to the same effect as if the same were now absolutely embraced herein.

"It is further agreed that the work shall be done on such parts of the line as the engineer may direct, and it is further agreed that the work shall be staked and prepared by the engineer at such time and in such manner as not to delay the second party in the prosecution of their work."

was to be allowed for all shrinkage of the earth arising from its being thrown into embankments and measuring less there than it did where it was taken from. But as this part of the charge is not so clear as to enable us to feel entirely certain of its meaning, we give it below * as we find it in the record.

A careful examination of this contract and specifications has not enabled us to find any thing to warrant the construction adopted by the circuit court. The contract plainly contemplates that, as a general rule, the road-bed will be an embankment which is to be made by earth thrown up from the ditches on either side, but that there would be places along the line of the road which were already too high, and to be brought to grade would be required to be cut down; and these are what are plainly referred to as "cuttings on the line of the road," the contents of which were to be "removed into the adjacent hollows to form embankment, unless otherwise directed." The ditches along the sides of the road, from which the roadbed is required to be formed, unless otherwise directed (when not made from the cuttings on the line), are not designated and cannot be treated as "cuttings" within the meaning of that term in the specifications.

Bearing these obvious considerations in mind, can there be any possible doubt of the meaning, or any room for con-

---

* "When the earth is taken out of the cuttings, if it is so directed, and it is most convenient, it is used to fill up the hollows, if there are hollows in the vicinity; but by the specifications here the embankment is to be made by the cutting of ditches in all cases where it can be done, unless otherwise ordered by the engineer. Now, where that is done you will see by these specifications that the excavation is measured. That is to say, if I understand this language, if I understand the process, the ditch is cut, say a yard wide and a yard deep, and the earth taken out of that is thrown up as an embankment. Now, according to this contract, the space from which the earth is taken is measured. If it makes only half a yard when placed on the embankment, it is measured as a yard. If it makes a full yard, it is measured as a yard,—so much earth has been excavated, and so much earth has been removed, and that is determined by the space that earth occupied, which can be readily measured. But the earth taken from the cuttings is measured in the embankment. But, gentlemen, how is this measured separately from the other where

struction of the provision: "When the excavation is used in the embankment, the embankment only will be measured; when the excavation is thrown into spoil banks, the excavation will be measured?" The word "excavation," as first used in the provision just quoted (that is, "when the excavation is thrown into embankment"), applies as well to the earth taken from the ditches as from the cuttings. There is nothing in the specifications to show that its meaning was intended to be limited to that part dug from the cuttings; and earth taken from the ditches would in a general sense be "excavated;" but when the term excavation is used the second time in the provision quoted, the very extent of the provision, and of the subject to which it relates, shows that it is limited to the excavation made in the "cuttings" referred to, or at most to these and to ditches in places where to make them continuous required more earth to be thrown out than was required in the adjacent road-bed or embankment; since in no other cases was it contemplated that earth thrown from ditches would be thrown into "spoil banks."

We think it clear that the rule intended to be established by these specifications was, that all earth thrown into embankments (that is, for the purpose of bringing it up to grade), whether taken from ditches along the side, or from "cuttings on the line," should be measured "in the embankment," and not as excavation according to the

a part of the earth taken from a cutting is used and a part thrown up from the ditch; or what data have you, or have you any data by which you can distinguish one from the other, or was it understood, or ought it to be understood from the language here used, that a different rule of measurement should be adopted where the earth is taken from the cutting, from that adopted where it is taken from the ditches. If I understand these specifications it means simply this: where the earth excavated and thrown out is not used in embankments, the excavation is paid for by the cubic yard, and the space from which it is thrown out is measured. But if the earth is used at the same time in an embankment within six hundred feet, instead of being thrown out outside of the cut, then this excavation and the embankment should not both be computed, but only one, and this contract says that then the embankment only shall be measured, and not the cutting. If it is thrown out and not used at all, then the space it occupied before its removal is measured, and no matter

space it occupied before removed; and that all the earth thrown into spoil banks was to be measured as excavation, because it could not be measured in embankment, and would naturally be thrown into such irregular masses as to be difficult of measurement, otherwise than as an excavation, by measuring the space it occupied before removal. It does not appear that there was in this case any instance in which any earth was thrown into spoil banks; nor, of course, that a part of the excavation from the same cuttings was thrown into embankment and a part into spoil banks; nor that there was any place where the same space in length of embankment was made in part by earth thrown from the side ditches and in part by excavation from cuttings; and, therefore, none of the difficulties are shown to exist, upon which the court seems to have relied, as justifying the construction, that measurement by excavation was the rule of the contract. But the construction adopted by the court does not get rid of the difficulty of measurement, when a part of the earth thrown out, whether from ditches or cuttings, is into embankment, and a part into spoil banks, should any such instance be shown to have occurred, any more than that we have indicated as the true one; there would still be the same difficulty of determining the respective amounts of each, which should be measured as embankment or as excavation. But this difficulty, if it were by the facts shown to have arisen, is by no means insuperable,

---

whether it makes more or less when thrown out, if it is not used in the embankment. It is claimed that this earth, when taken out and placed in an embankment, shrinks, that is to say, it does not make the same quantity there, in measurement, that it made in the space occupied before it was excavated; and in view of this fact, and in order to approximate by a measurement of the embankment itself what the excavation has been, that a certain deduction ought to be made, and it is obviously so, gentlemen, if the pay is for the excavation, and the excavation is to be measured, if that is the measurement established by the contract, then it is clearly necessary; if this difference is produced in the quantity in the embankment or in the excavation, that there should be some rule by which it can be known with sufficient certainty, proximately, what amount of earth was excavated, and a proper allowance made, if the quantity is actually diminished after being put in the embankment, if the embankment only is measured."

as a different rule of measurement was to be adopted as to the respective portions of the same embankment, both parties would be interested in ascertaining the respective amounts of each, and this might be ascertained by several measurements as the work progressed; and if these were not made, then by the best estimate witnesses might be able to make of the respective amounts of each.

The interpretation we have adopted as the only fair meaning to be drawn from the portion of the specifications already quoted is consistent with and sustained by all other portions of the specifications relating in any manner to the question. Thus, immediately following the portion already cited they proceed:  "The embankment is to be twelve feet wide on top from shoulder to shoulder, and with slope of one to one in clay, and one and a half to one in sand, with a berme of from two to three feet left each side of said embankment.

"The excavation" [here evidently meaning in the cuttings] "is to be twenty feet at the bottom, with such slopes as the nature of the ground will admit. Any change that may be made in the width or height of any embankment or cutting shall not entitle the contractor to any thing extra beyond the measurement. The cuts and fills are to be of such depths and heights as shown on profile, and the ditches cut on each side of the road are to be continuous unless otherwise allowed by the engineer or superintendent in charge of work.

"*Tap drains.* When tap drains or ditches are necessary, they are to be dug by contractor at the same rate per cubic yard excavation as on the main line," [meaning very clearly as is allowed for excavation when by the contract that mode of measurement is to be adopted; and that mode of measurement is to be adopted as to tap drains generally, because generally the earth would not be thrown into railroad embankments; though in some places embankments might be required to complete the plan of drainage, and when this was done it might be measured as embankment; hence the specification

proceeds to say], "and all earth work necessary to be done for the completion of the work is to be done at the price agreed upon for the excavation and embankment," [ meaning as the earth may be thrown out as "spoil," when it would be measured as excavation, or as it might be used in embankment, when it would be measured as such], "unless when a special agreement is made with the proper officers of the company."

For the erroneous instructions of the court in reference to the mode of measurement, the judgment will have to be reversed. This might dispose of the case, but as a new trial is to be awarded, it is proper to dispose of some of the questions raised which will naturally arise again upon a new trial.

The first of these arises upon the plaintiff's claim for an excess in the amount of filling or embankment beyond that allowed by the engineer's estimates.

This claim arises in this way: it was proved and not disputed, that after the engineer had surveyed the road, made his profile and his table or detailed statement of cuts and fills, which was before the making of the contract, a great fire swept over nearly the entire line of road; and all the engineer's estimates of work done were made from the original levelings and the tables of cuts and fills, as made from the ground before the fire. And the evidence tended to show that most of the land over which the line of road ran, being low land with a mucky soil, a large portion of the surface was burned off, ranging from an inch or two in some places up to some two feet in others; and consequently that when the plaintiff proceeded to fill and embank, it required so much more earth ( by way of fill and embankment ) than was shown by the profile and table of cuts and fills made before the fire; and that the plaintiff had put in this additional amount, though the engineer's estimates upon which payments were made from time to time, were still according to his original work and measurement before the fire.

I can see no sound reason why the plaintiff was not clearly entitled to this additional work or measurement; and think the engineer should have added it to his estimates; and I think the court was right in so holding, though wrong for the reasons already stated, in connecting with this and submitting to the jury the question of the quantity of shrinkage arising merely from the fact that earth measures less when placed in an embankment than the space it occupied before removal.

It is assigned as error that the court erred in his construction of the following provisions of the contract, viz.: "Said parties of the second part" [ the contractors ] "agree to proceed with such diligence and with such force of laborers as the executive committee of said company may direct, to perform the work herein specified, and to complete the same according to the specifications as furnished by the engineer of said railroad company, and to the full satisfaction and acceptance of said engineer, and the executive committee, on or before the first day of August, 1872."

The court construed the provision giving the committee the right to direct as to the diligence and force to be employed, as subordinate to and qualified by the provision requiring the work to be completed by the day mentioned, and as inserted rather to enable the company to compel completion by that day by this power, which would enable them, if in their opinion the contractors were not likely so to complete it with the force of men employed, to compel them to employ more, or put an end to their contract and relet it to others, or employ others to do the work.    And upon full examination of the contract in connection with the subject matter and situation of the parties, we are satisfied that this is the more reasonable and the true construction.

The time for completion seems to be fixed, certain and imperative, with nothing in the language, and we find nothing in the subject matter, indicating that this time could be prolonged by the company at their option, by the

29 MICH.—56.

right of direction reserved. One of these provisions must, to avoid repugnancy, be subordinate to the other in its operation; and the order in which they are stated, the form of the language, the subject matter and situation, and (so far as we can discover) the apparent objects of the company, all indicate that the discretion or right of direction was intended to be the subordinate or auxiliary provision, inserted for the purpose of securing beyond contingency the completion of the work within the prescribed time; the provision for which was to be primary and absolute.

The evidence tended to show that the treasurer of the company, who was also a member of the executive committee, and the only one of them who, after the making of the contract, had any conversation or came in contact with the contractors, or who appears to have paid any attention to or taken any interest in the work or its progress, some three months after the contract, and while the work was going on, requested the plaintiff not to employ so large a force of men as he was then employing, and wished him not to employ so many as to bring his estimates above three thousand dollars per month, assigning as the reason, that it was difficult to raise the money, and that the company could not raise it so as to pay faster, and that the engineer told him substantially the same thing, or recommended him not to employ so much force as to bring the estimates higher; that plaintiff, when so requested by the treasurer, told him that at such a rate he could not complete the contract within the contract time, to which the treasurer replied, this was all they could collect, and that it would make no difference if not completed within the contract time; that they would stand by him and see that the contract was made satisfactory; that in consequence of this, and because the company could not raise money to pay faster, the plaintiff took off some of the force of men he had employed, so as to bring down his monthly estimates; and that a large part of the work was done after

the first of August, and from that time down to the latter part of December, when plaintiff quit the work; that in consequence of this delay, and of the price of labor having arisen, it cost the plaintiff more, and that he did the work at an increased expense above what it would have cost had he done the work within the contract time.

The testimony also tended to show, and upon this point there seems to have been no dispute, that the company, while paying more or less on the monthly estimates, never, at any time, paid the whole amount which by the contract they were at the time bound to pay; but were always in default, and for most of the time largely in default, and that there was almost always great delay in paying the estimates, and the amounts paid were generally in small sums, as it could be collected; that the difficulty of collection still continued at the time the plaintiff quit the work in December, leaving a part of the job uncompleted; that at that time the engineer directed him to stop for the time being, until they could see what they could do in regard to collecting money; that the plaintiff did quit; that the contract, had the company paid as agreed, was a valuable one to him; and the evidence tended to show the amount he could have cleared above the contract price, for the part left unfinished.

So far as relates, *first*, to this claim of the plaintiff, for the profits he would have made by the completion of the unfinished portion; and, *second*, to his right to extra compensation for the increased price of labor, above what it would have been had he been allowed to complete the work by the contract time, the plaintiff in error insists that the court erred in submitting these claims to the jury; because, as to the first, there was no evidence tending to show that the engineer had any authority to direct the plaintiff to stop the work, and that the plaintiff therefore stopped in his own wrong, and cannot recover the damages claimed on that ground; and as to the other point, the claim for increased compensation of labor from delaying the work

beyond the contract time, that there is no evidence tending to show that Campbell, the treasurer and member of the executive committee, who requested him to delay the work, or Mercer, the engineer, had any authority from the company for that purpose, or to make any arrangement, which it is claimed they did make, leading to the delay; and that plaintiff therefore can claim nothing against the company in this respect, based upon their action, or that of either of them.

As to the first point, the question of the engineer's authority in directing him to stop, is immaterial; as the evidence shows that the company were at all times, after the expiration of the first month, in default in the payments they had contracted to make, and there was no evidence to the contrary, the plaintiff would, by reason of these continued and repeated defaults, have been justified in quitting the work, and had a clear right to abandon it when he did, whether the engineer or the company requested him to do so or not, or though they might have wished him to continue; and upon thus quitting he would have been entitled to recover as damages what the uncompleted portion of the work would have amounted to, at the contract price, beyond the cost to him of completing it.

Upon this particular point, therefore, of the engineer's authority to stop the work, while I am not prepared to say the court erred in submitting it to the jury, and in holding that there was evidence from which they had a right to infer the authority, I do not discuss the question, because I do not think it material; the plaintiff himself, as all the testimony went to show, having the full right to stop the work, whether directed or not.

But, upon the question of the plaintiff's right to recover for the increased price of labor in consequence of delaying the work beyond the contract time, the company's failure to pay the money monthly, as agreed, though it would have justified the plaintiff in quitting the work and claiming damages for being thus prevented from performing it, would not justify

him, if he chose to submit to the delays, and to go on more slowly than he otherwise would, to claim any extra compensation for such delay; since, as the court very properly remarked, the law gives the damages for such delay by way of interest upon the money; and unless he delayed the work at the request of the company or some one purporting to act on its behalf, and who either had authority, or who, under the circumstances, the plaintiff had a right to assume had the authority to request the delay, or unless the action of such person or persons, purporting thus to act for them, was afterwards ratified by the company, or its proper officers, the plaintiff, when he chose to submit to such delay, or to go on more slowly, and to continue after the contract time, must be held to have been going on at the prices fixed by the contract. And in this view the question of authority of Campbell, the member of the executive committee and treasurer, or that of Mercer, the engineer, or of both, or a ratification of the acts of one or both of them, must be shown, or the circumstances must be shown to have been such that, as between the plaintiff and the company or its executive committee, the plaintiff had a right to assume that such authority had been given, or such acts and directions ratified.

Upon these questions the charge of the judge (which is given below*) was so full and correct, and in my view so

---

* "Then, gentlemen, the item which is most discussed in this case is one of one thousand three hundred and five dollars, for the increased expense of constructing what was constructed after the first of August, the time when, by the contract, the work was to be completed. As I construe this contract, gentlemen, it limited a time within which the plaintiff had a right to go on and complete the work, and if you are satisfied from the testimony that he went on with that intention, and with the ability to do so on his part, and was prevented from doing so by the act of the defendant, I think he would have a right to claim for the increased expense, not because they failed to pay him any thing that was due him from time to time on his estimates, because that he is compensated for in interest, and the very fact that the law gives him interest on his money is a conclusive reason why he should not have other damages. In such case as that he would have double damages, if, because they did not pay him money, he had interest, and also damages growing out of other circumstances which might or might not depend upon his furnishing

fair, that I think it wholly unnecessary to go over the entire ground, or to repeat the various points involved.

Upon a very careful examination of the charge, in connection with the facts and circumstances, I am inclined to think that if there was any thing in the charge to complain of on either side, it was not on the side of the defendant.

Though there were five members of the executive committee, to whom the company had entrusted its management, three of whom executed the contract with the plaintiff, and one of these only, who was also the treasurer, came in contact with the plaintiff, after the making of the contract, or assumed to give any directions, or to express the wish of the company for lessening the force of men employed,

the money and going on upon his own means. If men were responsible for all the consequences arising from their failure to pay money when due, everything almost that men have would be involved in the question of damages. If you fail to pay a promissory note at the time when it is due, it may occasion the holder of it the loss of business, it may ruin him, but the law will not hold you responsible; that is to say, it does not oblige you to shape your course with a view to contingencies of that kind. Men cannot do it; it would be impracticable. And so with this defendant; by its contracts it agreed to pay when the estimates were made, within ten per cent. of the amount of the estimates up to the time when the contract should be complete, yet the failure to do so is not of itself a circumstance which would entitle the party to damages, if by reason thereof, by reason of the failure to pay the money alone, he cannot fulfill his contract in time, but the law contemplates that he may have means of his own, or that he can loan the money if he has not it, upon credit, and go on with his work upon his own means. This may have been so with the plaintiff, or may not. It would authorize him to say to them, ' Gentlemen, unless I have my pay when it is due I cannot perform this contract; I will cancel it.' It was at his option to do so, and if they failed to pay him money when due, or whenever they failed to pay him what was due, they could claim no damages from him, whatever damages they might sustain by his leaving the contract. If they had to relet the contract, he would be justified in his act, but if he went on with the contract, so far as the failure to pay money is concerned, he is compensated by the interest.

" But, gentlemen, another question arises, and this is the most difficult one, perhaps, to be solved, and that involves also a question of law. It is this: whether there was any act on the part of the defendant, or omission on their part, aside from the non-payment of money, which of itself prevented Mr. Van Dusen from going on and fulfilling his contract within the time limited, that is, the first of August. The defendant here is a corporation. It embraces the legal person or entity known as the Grand Rapids and Bay City Railroad Company. They are the defendants in this case. It is not the executive committee, it is not the officers of this association who

so as to keep down the estimates within the company's means of·collection, or for the consequent delay, and though there is no direct evidence that he had the authority from the company or the rest of the committee, to do this, yet it must not be forgotten that every member of that committee had a duty to perform in looking out for the interests of the company, in seeing that the contract for the construction of the road was performed, and, if not, to ascertain the reason why; in attending to the progress of the work, and seeing that the contract was performed, as well by the company as the contractors; and if any changes were to be made to consult with each other as to what changes · would be desirable under the circum-

were authorized to bind the defendant, to act for it, to represent it. Here was an executive committee, and three members of that committee out of five made this contract with the .plaintiff. They did it as an executive committee. The plaintiff knew who these gentlemen were, who then composed the committee, because he made the contract with them, and they all signed it. By this agreement he was to go on with such force as they should direct, and complete it by the first of August. Did they ever direct what force he should use ? If they did not in fact do so, then he had a right to put on all the force necessarily required to fulfill his contract. After this contract was made was there any action of the executive committee, as a committee, directly in reference to this work, before the final abandonment of the work? If not, then did this committee act through some one else, through one of its own members, being the treasurer of the company, Mr. Campbell, through the engineer, such committee being substituted by the by-law, which was read here, to act in the place of the directors, subject, however, to the interference of the directors if they saw fit to interfere, but, without such interference, to go on and do all acts that the directors might do. They would have the control and direction of the engineer and the treasurer, and they must be presumed to be acting under the control and direction of the executive committee, I think, nothing appearing to the contrary. Now, if this executive committee appointed no other agent, no other medium between themselves and this contractor, but the engineer in charge of the work, and Mr. Campbell assumed to act and to represent the executive committee, would the company, the corporation, be bound by the acts of Mr. Campbell, and of the engineer? Clearly, gentlemen, neither the engineer nor Mr. Campbell had any right to vary this contract, that is, to make a new contract, without some express authority. The engineer, having the direction of the work by the contract, might give all directions in regard to the work, how it should be done, and all about it. You may infer, if he put an end to the work at a certain time, and the executive committee have never interfered, if they appear all the way through to sanction the acts of this party, and if they were in a situation where they had knowledge of his acts, and they did not repu-

stances, and among these duties, one of the most obvious and imperative, was, for each of the members to give notice to the others of every thing he might individually have done or claimed to do on behalf of the company, affecting their interests, as well as every other fact coming to his knowledge which it was important for his fellow members to know. These duties they cannot, without evidence to that effect, be presumed to have violated. The plaintiff, at least, who was attending to his part of the contract, engaged in doing the work on the ground, had a right to presume that these members of the committee were performing these duties on their part; and though but one of them assumed to appear in person to him and to express their wish, or

diate them, so far as they accepted the work, they are certainly bound by the acts of their assumed agents. But had Mr. Campbell any authority to say to the plaintiff along in May or June, when he was going on, if you please, with a force sufficient to have accomplished this work by the first of August, had the treasurer any right to say to him: 'You must discharge a portion of your men, you must re- duce your estimates to a certain amount, because there are not funds in the treasury to pay, and we cannot collect enough to pay?' I do not think, as treasurer, it was any part of his duty to give any di- rection as to the work, how it should be done, or when it should be done. As an individual member of the executive committee, he would have no such power. If the executive committee, by them- selves or by their authorized agents, whether Mr. Campbell or some- body else, had interfered and said to Mr. Van Dusen, 'You must discharge men and reduce your force so that your estimate will be only three thousand dollars a month,' then, I say, if he was delayed thereby in the accomplishment of the work, and it cost him more to do it than it otherwise would have cost him, he is entitled to recover what he has lost by reason of the increased expense. But if the committee have not acted by themselves or by their authorized agents in this interference, but the treasurer or any other person not au- thorized has advised this, and he has acted upon it, he is not entitled to any increased expense. He is to be taken as doing it voluntarily, and departing from the contract voluntarily and by agreement, he to take the consequences.

"But, gentlemen, it is a rule of law that where one assumes to do an act as agent, representing another, or a corporation, it makes no difference whether it is a person or a corporation, which is bene- ficial, and the act is afterwards ratified by the proper authority, it makes it binding upon the party benefited; it makes it his act. In this case was·Mr. Campbell invested with authority to do what he did, to give this direction? If he was not, was the authority he then exercised in any way ratified by the executive committee or by the board of directors, or some other authority of the company hav- ing power to do so? Have the company been benefited in any legal sense by the delay? It is urged upon you, gentlemen, that the pe-

that of the company, or to request him to act in a particular manner in reference to the work, he had a right, in the absence of any evidence to the contrary, to presume that the others had been properly consulted, and that he was acting not merely for himself, but as the organ for the expression of their collective wills as a committee, and at least, that if any one of them had ventured to act without their previous assent, he would at the first opportunity give them the information and obtain their approval and ratification, or notify the plaintiff of his failure to do so, that he might govern his actions accordingly. More especially had the plaintiff the right to presume this when the member of the committee assuming to give directions or to request delay on his part, is also the treasurer, having charge of the company funds, and the proper person to make payment to the plaintiff of his monthly estimates, who pays him all that is paid, though less than the amount due, asks the delay in the work for the very reason that he cannot otherwise collect the money fast enough to pay it as it becomes due: thus corroborating by the com-

cuniary circumstances of the company were such that it was inconvenient for them to raise the funds to pay the estimates for the completion of the work at the times when it would be due, if the work went on as contemplated by the contract; that they have been relieved, in other words, from their financial embarrassment to a certain extent, and if that is a benefit to the company, if they would be the beneficiaries of the work, they owning it when completed, there was a benefit conferred which they have received, which of itself would be a ratification of the act of authority which the agent assumed to exercise.

"I am inclined to think, gentlemen, that such a benefit is not what the law contemplates when it lays down the rule, that where a party is benefited by his accepting of the benefits which the act of the agent brought or proposed to bring, it constitutes a confirmation of the act. In one of the cases which has been referred to, that of two out of three parties who were authorized to act, or two parties who were authorized to act with the concurrence of another, going on and renting for the benefit of a corporation certain buildings, if the corporation had gone on and occupied the buildings and had the use of them, then it would be very unreasonable for them, and the court would not allow them to turn around and say that although we have had the benefit of these buildings, the renting was an act which the parties assuming to act had no power to do, it was an act beyond the power of the agent, and we will repudiate it. But that presents an entirely different case from merely aiding a corporation by con-

pany's failure to pay, the inference that he was representing the wishes of the company or its committee. Under such circumstances, with the engineer, the only person apparently taking actual charge of the work for the company, with ample powers of control, confirming the same representations, and advising obedience to the same directions, had the plaintiff any good reason to question the authority of the committee man and treasurer, who assumed to make the requests, or give the directions he did? And after a reasonable time had elapsed for the other members (supposing all to perform their duties), to obtain the information of what had been done by the one, had not the plaintiff good reason to believe that the act of the one had been approved and ratified by the others, who never dissented? or must the plaintiff in carrying on his work, as often as this (the only member who shows himself) assumes to do or say any thing affecting his work, stop his workmen and leave its supervision till he can call upon each member of the committee in turn, or get them all into an official meeting, to learn whether that member has not been acting

forming to their pecuniary circumstances, which may be or may not be beneficial. Then, gentlemen, has there been any ratification of their act in any other way? If it has not been ratified by the acceptance of the benefit contemplated by it in a legal sense, then have they ratified it by any other act? Whether it was known to the executive committee that Mr. Campbell made this arrangement, or interfered to give this direction to the contractor, or not, is a question of fact only to be determined from the evidence. If they had no knowledge of it, if there is no evidence that they had any knowledge of it, then the question would arise whether you can presume it from facts and circumstances. If the work went on from the first of August to some time in December, several months, and this committee were in the performance of their duties, managing this work, did they or did they not know all about it, and how it was managed; and although they did not actively interfere to give directions, did they or did they not know of and tacitly assent to this arrangement? I think, perhaps, gentlemen, if you deem the testimony strong enough to infer that they did know and tacitly assent, made no objection, that it may be regarded as a sanction of the act, a ratification of the direction given by one of their number, who may be supposed to have acted with them, they acting together as a committee, if they acted at all, and he had given such information as they desired, and as he might have to communicate at their several meetings. In that case, if they then adopted the act, they would be responsible for it."

wrongfully and without authority ? Does not the very fact, that the other members do not come forward to take any direct part, tend to confirm him in the opinion that they are cognizant of his action and satisfied with it?

I think the circuit judge did not give any too much force to these considerations, and that they were rightly submitted to the jury.—See *Wildey v. Fractional School District, 25 Mich., 419.*

The only error in the case was that of the misconstruction of the contract in respect to the mode of measurement; for this, the judgment must be reversed, with costs, and a new trial awarded.

The other Justices concurred.

