# JANUARY, 1912.

HARDEMAN-KING LUMBER COMPANY v. HAMPTON BROTHERS.

No. 2186.   Decided January 17, 1912.

**1.—Contract—Abandonment—Declared Intention.**

A declared intention to refuse to complete the performance of a contract by one who, having commenced, is still continuing to perform its obligations, can not be treated as an abandonment. The other party who because of such antici-

pated breach makes default in performance on his own part will be denied relief in suit upon the contract, because he has first terminated it by refusal to perform. (Pp. 588, 589.)

**2.—Same—Case Stated.**

Defendants had contracted to haul the logs from certain land to a lumber company's mill, agreeing to forfeit all sums already earned in case of their refusal to complete. Having earned and been paid $7,250 they complained that they were losing money, demanded greater compensation and announced that they would not complete the contract unless it was granted. Plaintiff, the mill company, which was further indebted to them under the contract, demanded before paying them, a promise that they would complete it. Defendants refused to state what they would do, saying, "We haven't quit, have we?" and continued performance on their part till the company refused to pay the money due. Held, that the contract was not broken by defendants, but by plaintiff, and the latter could not maintain suit on the contract to recover back the money paid to defendants for their part performance. (Pp. 586-589.)

**3.—Counterclaim.**

Defendant, sued for breach of a contract, could set up and recover on a counterclaim for money due, not only upon that, but upon another and independent contract with plaintiff. (P. 589.)

Error to the Court of Civil Appeals, First District, in an appeal from Nacogdoches County.

The lumber company sued Hampton Bros., and defendants, who asserted a counterclaim, had judgment against them. Plaintiffs appealed, and on affirmance obtained writ of error.

*Blount & Strong,* for plaintiffs in error, cited: On application of payments: Stone v. Pettus, 105 S. W., 413; Thatcher v. Tillery, 30 Texas Civ. App., 327.

That defendants were not carrying out their contract in good faith: Choate v. Railway Co., 90 Texas, 88; Eastham v. Hunter, 98 Texas, 564; Bank v. DeBerry, 47 Texas Civ. App., 96.

No such breach by plaintiffs as would justify defendants in abandoning the contract: Simkins on Contracts and Sales, 248.

*Ingraham & Hodges* and *V. E. Middlebrook,* for defendants in error.

MR. CHIEF JUSTICE BROWN delivered the opinion of the court.

The plaintiff in error, hereafter called "the company," instituted this suit to recover from defendants in error $7,250 actual damages, accruing from the breach of a contract, whereby defendants agreed for a specified consideration to cut and deliver to the company at its sawmill all of the logs suitable for lumber growing on 640 acres of land and upon which contract the company had paid to Hampton Bros. the sum sued for as compensation for logs hauled. The contract provided that if Hampton Bros. failed to comply with the contract they should forfeit what they had earned. The defendants filed a general denial and pleaded in reconvention a claim for $600 for hauling logs from a different survey.

We copy the following from the opinion of the Court of Civil Appeals:

"On November 20, 1908, the lumber company was indebted to Hampton Bros. in the sum of \$1126.61. Of this amount \$599.42 was for cutting and hauling timber off the 640-acre tract; \$508.59 for cutting and hauling timber off the Lavine tract, and \$18.60 for an amount due Hampton Bros. for oats. At this time Hampton Bros. were due the lumber company a store account amounting to \$599.65. Previous to the date mentioned Hampton Bros., claiming that they were losing money on the contract, endeavored to prevail on the lumber company to increase the contract price of cutting and hauling, but without success. On October 18, 1908, J. J. Hampton, one of the members of the firm, wrote to the lumber company to the effect that the latter had not advised him in regard to the increase in logging, and saying he would be glad to hear at once from the lumber company in regard to the matter, as it was something that needed attention. On October 21 following said Hampton telegraphed the lumber company to wire its decision in regard to the matter of the last conversation. The conversation was in relation to the increase of the contract price for hauling, etc. On October 29 said Hampton again wrote to the lumber company, saying, '. . . if you do not see fit to make change at once I will be forced to close the business down, as I cannot do the work at the present figures.'

"S. T. King, a member of the firm of Hardeman-King Lumber Company, testified that about the 10th of November, 1908, feed was getting low and he told Tom Hampton, the other member of the firm of Hampton Bros., that if they were going to quit their contract 'we did not care to order a carload of feed and put it in our feed house when we did not know whether we would have any teams on the job to feed it to or not,' and I says, 'We should come to some understanding as to what we are going to do,' and he suggested, or we talked the matter over, and we finally thought it would be a good idea to get local shipments of feed. Then he came to Nacogdoches—this was up past payday—and we owed them some money on some other hauling, which I think was something like \$500, and he still seemed to have no information as to what they expected to do, so I said to him, 'Tom, we surely can not go on in this state of uncertainty; it is an expense to you and it is an expense to us, and it seems to us that you are waiting—you have advised us you are going to quit, and we have made you several propositions and you will not say what you are going to do.' 'Now,' I says, 'if you think you are going to get this payday and then quit, you can relieve your mind of that, because we don't expect to pay you any money until you people tell us what you are going to do.' . . . His reply was, 'We have not quit,' and I says, 'No, but you say you are going to quit, and all indicates to us that you are going to quit, and we will just bring this to a focus; if you are going to quit you can quit, and if you are, we don't propose to pay you this money; however, if you will tell us you will continue under the contract we have, or under either of the other propositions which we have made you, we will pay you your money.' He never said what he would do; and later in the day it dawned on me again that the feed was getting low, and I went to Tom and says, 'What do you propose to do? Feed is

getting low; I ought to order more. We would like to know what you people are going to do,' and he still would not say what they were going to do, and the substance of what I could get from him was that they had not quit; and I says, 'We are not going to live under this suspense any longer, . . . and we don't propose to pay you the money we owe you or furnish any more feed until you tell us what you are going to do; if you will accept any of the propositions we have made you, your money is ready, and I will order feed, and you can decide later which one you want to accept.' We owed them about $500 at that time. His reply to that was, 'I will not tell you a lie for $500.' This witness further testified that at the time of the conversation detailed above his firm also owed Hampton Bros. something over $600 for cutting and hauling timber from another tract; and further, 'We didn't pay Mr. Hampton because he said he could not carry on his contract any further, and we told him if he was going to quit we would not pay him the money that was due him at that time. He was working at that time; he was hauling logs when we had this first conversation. He told me in Beaumont about the first of October that they could not deliver logs at that price, but they delivered logs after that and were hauling logs on the 20th of November. . . . They were hauling logs on the 15th of November when they demanded their pay. . . . Our payday was the 15th; I told him about the 20th of November, the day he quit work, I was not going to pay him what I owed him unless he agreed to go on with the contract, and I told him, 'Just to be plain with you, we are not going to pay you any money until you tell us what you are going to do; and he said, "We have not quit, have we?"

"John Hampton testified: 'I tried to comply with the contract all the way through; told Mr. King I wanted to help him out and wanted to log the mill and was going to do it; we were still trying to comply with the contract. . . . . If plaintiff had paid the money due us we would have continued to run the mill; we never had any understanding that my brother would demand payment, get the money and forfeit the contract; that was not our intention; I did try to get him to raise the price, but I had no intention of quitting the contract.'

"'Tom Hampton testified: 'He refused to pay without I would agree to carry out the contract. I told him I had a written contract I had been working under all the time and I did not see any use to make any agreement about it; that we were logging the mill and had been logging it, and the teams were going regularly. He would not pay unless I would agree to go on. When I came to Nacogdoches the teams were hauling logs, and when I went back down there (Newton County) they were hauling logs. I told them to get some feed, and he said they were not going to get any feed until I promised to complete the work.' "

The evidence was sufficient to justify the conclusion that defendants in error intended to abandon the contract, but the evidence is uncontroverted that they were engaged in performing the work under the contract. The intention or threat to quit did not constitute a breach

of the contract, and the plaintiffs in error, having refused to proceed with their part of the contract, had no right of action against Hampton Brothers.  Kilgore v. N. W. T. Baptist Educational Assn., 90 Texas, 143.

In the case just above cited this court said:  "If Kilgore in this case were proceeding in good faith to perform the work, although while so engaged he might have announced that he intended to abandon it at some future date, the other party would not have had the right to declare such intention of abandonment to constitute a breach of that contract, because the performance of it was then in the course of completion.  The ground upon which it is held that when one declares that he will not perform a contract, the performance of which is to begin in the future, the other party may accept this declaration as a breach is that the contract is thus repudiated and, so far as one party can do so, the contractual relation between the parties is destroyed.  Clark on Contracts, 645; Zuck v. McClure, 98 Pa. St., 545.  When the promisor is in good faith, actively engaged in the performance of a contract, a declared intention to abandon it at some future time, however positively made, could not operate to terminate it, because he at the same time would by his act of performance be in a more emphatic manner affirming the existence of the contract and maintaining the terms thereof."

Article 750, Revised Statutes, reads:  "Whenever any suit shall be brought for the recovery of any debt due by judgment, bond, bill or otherwise, the defendant shall be permitted to plead therein any counterclaim which he may have against the plaintiff, subject to such limitation as may be prescribed by law."

The counterclaim set up in this case was within the terms of the statute.

There is no error in the judgments and they are affirmed.

*Affirmed.*