### WATERMAN LUMBER & SUPPLY CO. v. HOLMES.

(Court of Civil Appeals of Texas. Galveston. Oct. 23, 1913. On the Merits, Nov. 18, 1913.)

#### On Proceeding to Strike Briefs.

1. APPEAL AND ERROR (§ 767*)—BRIEFS—FORM —NECESSITY OF "PRINTED BRIEF"—"WRITTEN BRIEF."

Under Rev. Civ. St. 1911, art. 1614, providing that when a cause or suit is taken to the Court of Civil Appeals by appeal, writ of error, or otherwise, the attorney for either party may file written or printed briefs, or argument, if written, not to exceed 15 pages, and rule 37 as amended (149 S. W. x), providing that the copies of the briefs filed in the appellate court shall be plainly written or printed, and if it covers more than 15 pages of foolscap, shall be printed, a typewritten brief is a written and not a printed brief, and a typewritten brief containing 40 pages will be stricken out.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3102; Dec. Dig. § 767.*]

#### On the Merits.

2. CONTRACTS (§ 323*)—ACTIONS FOR BREACH —QUESTIONS FOR JURY.

In an action for refusing to permit plaintiff to perform a contract for the hauling and distributing of railroad ties along a railroad, evidence *held* to make a question for the jury as to whether plaintiff abandoned the contract before the cancellation thereof by defendant; and hence the court improperly charged that the evidence showed no breach by plaintiff.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1311, 1349, 1466, 1543–1548, 1827, 1827½; Dec. Dig. § 323.*]

3. TRIAL (§ 191*)—INSTRUCTIONS ON WEIGHT OF EVIDENCE.

In a contractor's action for damages from defendant's refusal to permit him to perform a contract for hauling and distributing railroad ties along a railroad, an instruction that the contractor could recover only such profits as he would have made by hauling the ties as defendant made them and demanded them; that, in arriving at his damage, the irregularity of the job, if any, its distance from the contractor's home, the expense he would have gone to in feeding his team, keeping up his harness and wagons, for drivers for teams, and all other expenses, should be considered, figuring only his net profits, if any, that he could have made under the contract—was properly refused, as it was on the weight of the evidence, and assumed that the irregularity of the job, etc., were parts of the expense of performance.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 420–431, 435; Dec. Dig. § 191.*]

4. DAMAGES (§ 62*)—DUTY TO MINIMIZE— BREACH OF CONTRACT.

Under a contract for hauling and distributing ties along a railroad, the contractor, upon the refusal of the other party to permit him to perform, could not sit idly by and wait until the completion of the hauling, and then recover the net profits which he would have made had the contract not been breached, but was bound to use his wagons and teams in other employment, if there was any he could get, and the amount that he could have so made should be deducted from the amount to which he would be entitled had he carried out the contract.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 119–131; Dec. Dig. § 62.*]

5. DAMAGES (§ 124*)—MEASURE OF DAMAGES— BREACH OF CONTRACT.

A contractor was entitled as damages, for the failure of the other party to permit him to perform the contract for hauling and distributing railroad ties, only to the net profits of the enterprise, which would be the difference between the contract price and the expenses necessarily incident to the performance of the contract.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 326–338; Dec. Dig. § 124.*]

Appeal from District Court, San Augustine County; A. E. Davis, Judge.

Action by W. H. Holmes against the Waterman Lumber & Supply Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Davis, Davis & Davis, of Center, for appellant. Blount & Strong, of Nacogdoches, for appellee.

McMEANS, J. [1] Article 1614, Revised Statutes 1911, provides: "When any cause or suit may be taken up from any inferior court to the Court of Civil Appeals, whether by appeal, writ of error, or otherwise, it shall be lawful for the attorney for both plaintiff and defendant to file in the papers of said suit or cause written or printed briefs, or argument, if written not to exceed fifteen pages," etc. Rule 37 (149 S. W. x), as amended by our Supreme Court on October 30, 1912, and which amendment became effective November 15, 1912, provides: "The briefs of the parties, framed in accordance with these rules must be signed by the party or his counsel * * * and the copies thereof filed in the appellate court shall be plainly written or printed, and if it covers more than fifteen pages of foolscap, they shall be printed." In National Bank v. Lovenberg, 63 Tex. 512, our Supreme Court held; in effect, that a typewritten brief should be regarded as a written, and not a printed, brief. See, also, Heath v. Hall, 27 S. W. 160. Appellant's brief is violative of the statute and rule above quoted, in that it consists of more than 40 typewritten pages. As said in Heath v. Hall, supra, "We must insist on a compliance with this rule, as it is intended to aid in the dispatch of business."

The briefs are ordered stricken out and returned to appellant's counsel, and appellant will be allowed to file copies of its brief, either properly written or printed, within 15 days from this date, and in case of failure so to do, the appeal will be dismissed.

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

## On the Merits.

This suit was brought by W. H. Holmes, appellee, against appellant, Waterman Lumber & Supply Company, to recover damages for an alleged breach of a contract by appellant, which appellee claimed he had with it, for the hauling and distribution of railroad ties along appellant's railroad. Appellee alleged that he contracted with appellant to haul and distribute 180,000 ordinary ties, for which he was to be paid five cents each, four cents to be paid at the time the work was done, and the remaining one cent to be paid on the completion of the contract, and 380 sets of switch ties, of 48 ties to each set, for which he was to be paid ten cents for each tie, eight cents to be paid when the ties were hauled, and the remaining two cents when the hauling was completed; that after he had hauled a part only of the ties the appellant breached the contract by refusing to allow him to perform it further, whereby he sustained the damages for which he sues.

[2] The court charged the jury that: "The first disputed issue for your decision is whether or not there was made and entered into by the plaintiff and defendant a contract, as alleged, for hauling and distribution of the ties along its railroad track and spur tracks. If you find there was a contract so made between plaintiff and defendant that Holmes should haul and distribute certain ties and receive certain compensations for the ties, then you are instructed that the evidence failed to show the breach of the contract by Holmes," etc. This charge is assailed by appellant by its first assignment of error, its contention, in effect, being that there was sufficient evidence to raise the issue of abandonment by Holmes of the contract, and that therefore the court was not authorized to take the question from the jury by charging that the evidence failed to show such breach by Holmes. By finding in favor of Holmes the jury necessarily found that a contract substantially as alleged had been made between him and the appellant. There was positive evidence that on January 17, 1912, the appellant by a letter written to Holmes on that date notified him that it had canceled the contract, and that it had made other arrangements for the hauling. It was shown by the testimony of the witness Weaver, appellant's agent, that the reason of appellant for canceling the contract was that theretofore, on December 24, 1911, Holmes had killed its foreman, Boatman. Holmes testified that he had not abandoned the contract, but was carrying it out in good faith at the time of the breach by appellant. But appellant contends that the evidence is sufficient to raise the issue of abandonment of the contract by Holmes prior to the 17th day of January, 1912, when appellant wrote the letter canceling the contract. If this contention is sustained by the evidence in the record, the charge complained of should not have been given, but the issue as to which party breached the contract should have been submitted. The evidence relied upon by appellant as being sufficient to require the submission of this question is as follows: It was shown that Holmes had his hauling camp about eight miles from his home, and that on or about the middle of December, 1911, he took down his tent and moved his camping outfit, his teams, wagons, etc., to his home. The witness John Fountain testified that about the 14th or 15th of December, 1911, he had a conversation with Holmes before he took up his tent and moved his camp in which Holmes stated he had gotten the cream out of the haul, that it had gotten bad and boggy, and that he was going to quit. Continuing, the witness said: "He wanted me to cash some checks for him, and he wanted to get the checks cashed before the company found out that he had broken the contract; that if they found out that he had broken the contract before he got the checks cashed, he was afraid the company would not pay the checks. On the same day, in the evening, Holmes came to the store and wanted me to cash the checks for him; I told him I couldn't cash them, and he said he reckoned he would have to go to Nacogdoches; that he wanted to get them cashed before the Waterman Company found out he had broken the contract; that if he didn't, he would have to sue them to get a settlement." Further on the witness said, on cross-examination: "I don't think he broke it, unless he just pulled up and quit. The weather was very bad when he quit. It was nearly impossible to haul in the woods. He was a right smart ahead of the steel. It was some time after he quit before the steel got to the point where he was. I don't know whether he said he had broken the contract. He told me that he wanted to check up on this tie haul, the weather had gotten so bad he could not possibly haul there, and he quit on account of the weather; that was the reason he quit."

J. L. Francis testified that he knew Holmes intimately; "was making ties in the vicinity where Holmes was hauling; that on or about the 14th or 15th day of December, the day that Holmes was pulling up and moving his camp and things, I asked Holmes at the camp, 'What does this mean, Hill?' and he said: 'I have got about all of this that is good, and I am going home; I ought to have been in Waterman yesterday in place of being here taking up these ties; if I could have been in Waterman I could have made a deal for a better job than this. I believe I can make the same deal to-morrow.' Most of the time that Holmes hauled he was hauling the ties nearest the track. He left the ties farthest back from the track, and they were still there when I left. I know I had the conversation with Holmes; Holmes said that he ought to have been at Water-

man yesterday. He said he could have made a deal for a job that would suit him, if he went. He had not said what the job was. The woods was full of hackers at the time Holmes was hauling; they were making them while he was there hauling. They did not haul all of the ties."

Henry Courtney testified that he did not know when Holmes began hauling, but that he quit about the 15th day of December. He further testified: "About 10 days before he quit, Holmes told me that he was going to quit hauling, as he had got about all that was good out of it. That was two or three days before he quit. He took his camp home where he lived. I don't know what he did after he quit. I know how many teams he had of his own. He had his camp near his work, close to Ironosa, Tex. Holmes stayed at his camp and at home. about eight miles from the camp. He pulled up his camp and went home, and took his camp and his teams with him. That was two or three days after he told me he was going to quit the job. He told me he had got all of the good out of the job, and was going to quit." He further said: "Holmes quit hauling ties about 10 days before Boatman was killed. I never knew or heard of Holmes hauling any more for the company after he quit."

We think that this evidence was sufficient to raise the issue of abandonment of the contract by Holmes prior to the time the appellant sought to cancel the contract by its letter of January 17, 1912, and required the submission of the question to the jury. If the testimony is to be believed, and its credibility was for the jury, Holmes quit the work and abandoned the contract about December 15, 1911. The cases of Hardeman-King Lumber Co. v. Hampton Bros., 104 Tex. 585, 142 S. W. 867, and Kilgore v. Baptist Educational Ass'n, 90 Tex. 143, 37 S. W. 598, relied upon by appellant, are cases in which it was shown that, while the contractors had threatened and intended to abandon their contracts, at the time of the breach by the other parties they were engaged in performing the work under the contract. It was held that the intention or threat of the contractors to quit did not constitute a breach of the contract, and, the other parties having refused to proceed with their part of the contract, had no right of action against the contractors. In the case before us, if the testimony we have quoted be true, and that was for the jury to say, the issue was raised that Holmes not only threatened, but had actually abandoned, the contract before appellant refused to perform its part of it. We think, therefore, that the court erred in withdrawing this question from the jury in the charge complained of, and that this error requires a reversal of the judgment.

[3-5] On the measure of damages the court instructed the jury as follows: "And, in this connection, you are charged that in such case the legal measure of damages for. breach of contract of the nature of this alleged contract is the profits, if any, the plaintiff would realize from the performance of the contract if the same had not been breached, and this you will arrive at from a consideration of all of the testimony in the case, and so assess, if any, in your verdict." The defendant requested the court to charge the jury, on the measure of damages, as follows: "You are instructed, as a part of the law in this case, that if the plaintiff is entitled to recover at all, he is only entitled to recover such profits as he would have made by hauling ties as the defendant made them, and when demanded by the defendant; and, in arriving at the damage, if any, you will take into consideration the irregularity of the job, if any, the distance it was from the plaintiff's home, the expense he would have gone to in feeding his team, the expense in keeping up his harness and wagons, his expense, drivers for teams, and all other expenses, figuring only his net profits, if any, he could have made under the contract, if you find there was a contract, and from such amount thus obtained, deducting such amounts as the evidence shows he would have earned at other and similar work, and let the amount thus obtained represent the damages you find for the plaintiff." The giving of the charge and the refusal of the court to give the special charge are the bases of appellant's third and tenth assignments. We think that the court's charge was wrong because the amount of money that Holmes could have made by the use of his teams in other work while not using them in the performance of his contract after the contract had been breached by appellant, if it did breach it, was disregarded. We understand the law to be that if the appellant did breach the contract, Holmes could not sit idly by and wait until the completion of the hauling and then recover from appellant the net profits he would have made had the contract not been breached, but that it was his duty to make use of his wagons and teams in other employment, if there was any he could get, and the amount that he could have so made, or ought reasonably to have made in this, should be deducted from the amount he would be entitled to recover had he carried out the contract. Again, he would not be entitled to the profits, but only the net profits, of the enterprise, which would be the difference between the contract price and the expenses necessarily incident to the performance of the contract. Appellant had this idea in view when it asked the special charge be given, but we think the special charge was upon the weight of the evidence, and should not have been given, because it assumes that the "irregularity of the job, the distance it was from plaintiff's home," and

other matters mentioned in the charge were parts of the expense of performance.

For the errors indicated the judgment of the court below is reversed and the cause remanded.

Reversed and remanded.