## ULEN SECURITIES CO. v. CITY OF EL PASO.

No. 2798.

Court of Civil Appeals of Texas. El Paso.
March 30, 1933.

Rehearing Denied April 20, 1933.

Turney, Burges, Culwell & Pollard, R. F.
Burges, and Walter S. Howe, all of El Paso,
for appellant.

J. H. McBroom, City Atty., and Frank B.
Clayton, Asst. City Atty., both of El Paso,
for appellee.

PELPHREY, Chief Justice.

In September, 1931, the city of El Paso
proposed to issue approximately $1,500,000
worth of funding bonds in accordance with
the "Bond and Warrant Law of 1931" (Acts
1931, c. 163 [Vernon's Ann. Civ. St. art. 2368a,
§§ 1–11]), and on September 10, 1931, bids
from prospective purchasers were open and
a contract to sell said bonds was entered in-
to with the firm of Glaspell, Veith & Dun-
can, of San Antonio, Tex. As a part of the
contract, Glaspell, Veith & Duncan posted
a cashier's check for $15,000 with the State
National Bank of El Paso, Tex.

That part of the proposal relative to the
depositing of the check, reads: "As an ev-
idence of our good faith in carrying out the
terms of this agreement we deposit here-
with a $15,000. cashier's check on the State
National Bank of El Paso, Texas, which is
to be forfeited by us as full and agreed liq-
uidated damages should we fail to comply
with the terms of this agreement. This check
is to be returned to us on demand should
the legality of the bonds be disapproved by
our attorney, and is to be applied and ac-
cepted as part payment as of this date for
the foregoing legally issued bonds when de-
livered to us as herein provided."

On September 18, 1931, Glaspell, Veith &
Duncan assigned their interest in the con-
tract to appellant, which assignment was ac-
cepted and acquiesced in by appellee on Oc-
tober 28, 1931.

On October 29, 1931, Mr. Sutherlin, a rep-
resentative of appellant, came to El Paso
and had a conference with certain of the
officials of appellee. Another conference was
held on October 31, 1931, at which the mayor,
a majority of the city council, and repre-
sentatives of the banks were present.

Immediately after the latter conference,
the mayor indorsed the check for $15,000
and ordered it deposited to the credit of ap-
pellee, and on November 4, 1931, the city
council passed a resolution declaring the $15,-
000 forfeited.

Appellant after requesting the return of the
cashier's check filed this suit. The cause
was submitted to a jury on the following spe-
cial issue: "Do you find from a preponder-
ance of the evidence that on or prior to the
date that the defendant cashed and appro-
priated the $15,000.00 check in question here-
in that the plaintiff had notified the defend
ant in substance that it would not perform
the contract with reference to the purchase
of the funding bonds described in the con-
tract between the City and Glaspell, Veith
& Duncan, which had been assumed by the
plaintiff?"

Upon an affirmative finding by the jury
on the above issue, the court rendered judg-
ment that appellant take nothing, and it has
appealed.

Opinion.

In this case there is involved the ques-
tion of anticipatory breach of a contract.

That a contract may be thus so breached as
to authorize the recovery of damages there-
for by the other party has been clearly rec-
ognized by our Supreme Court. Hardeman-
King Lumber Co. v. Hampton Bros., 104 Tex.
585, 142 S. W. 867; Kilgore et al. v. North-
west Texas Baptist Educational Association,
90 Tex. 139, 37 S. W. 598.

It has, however, been held that in or-
der to thus breach a contract, the intention
to abandon the contract at some future date
must be declared in positive terms and uncon-
ditionally, and that a declared intention to
abandon at some future date, however pos-
itively made, will not operate to terminate
the contract, if the promisor is at the time
in good faith actively engaged in its perform-
ance. Kilgore v. Northwest Texas Baptist
Educational Ass'n, supra.

It therefore follows that in the present
case it must appear, before appellee would
have a right to declare the check forfeited,
that appellant had, in positive terms, and
unconditionally, declared its intention to not
comply with its contract, and further, that it
was not, at the time of making such declara-
tion, in good faith engaged in the performance
of its part of the contract.

Appellant contends that there was no posi-
tive repudiation of the contract shown and
that the evidence shows that it was continu-
ing to perform its contract.

In support of its contention that it was
continuing in its performance of the con-
tract, appellant quotes the following testi-
mony of its witnesses O'Neil and Sutherlin
and of Mayor Sherman:

"Q. Mr. O'Neil, where were you on about
the 28th of October, 1931? A. In New York
City.

"Q. Was anyone in El Paso representing
you or the Ulen Securities Company on or
shortly after the 28th of October, 1931? A.
Yes, sir, I recall Mr. Sutherlin leaving Dal-
las on the 28th day of October and reaching
here on the 29th of October.

"Q. Of October. Did you, while in New York, receive any communications by wire, letter or telegram from Mr. Sutherlin in regard to the negotiations with the City of El Paso concerning the purchase and delivery of the funding bonds? A. Yes, sir. * * *

"A. I cannot say exactly when it was. There were several different kinds of telegrams, it was not material when we did not get it, but we had a good deal of trouble, if I may digress a little on this, getting all the attorney wanted, to satisfy them on this matter, and Mr. Austin went to New York, and in telegraphic communication there with Mr. Austin, we had word that practically all of the serious matters were out of the way and Thomson, Wood & Hoffman thought they could approve the first installment."

"Q. Where were you on the 22nd of October? A. You are getting right down to date now.

"Q. You were in New York on the 30th? A. I will try and tell you exactly where I was on that date. It was just about the time I was on the trip, or started back. I believe, however, I was—I cannot say positively, but I was likely in Indiana somewhere.

"Q. You went to New York to persuade Thomson, Wood & Hoffman not to approve them, didn't you? A. I did not.

"Q. Mr. O'Neil, what was the object of your interview with Thomson, Wood & Hoffman in New York on the 29th of October, 1931, with reference to the El Paso funding bonds? A. To find out, if possible, what would be necessary to secure their formal opinion on the first installment of the bonds and what their attitude was toward the possibility of their approval of the second installment."

Sutherlin testified:

"Q. Before coming to the Monday meeting I will ask you whether during the conference of the 31st, and at the time of the conference, whether you acquainted the City authorities with the fact that the President of the Ulen Securities Company was in New York, and you were in communication with him about the sale of the bonds? A. Yes, sir.

"Q. Neither you nor your company have got a scratch of paper, by which you can prove to this court, that Thomson, Wood & Hoffman disapproved any part of these bonds, have you? A. We may have in the office. We spent a lot of money going there talking it over with them, telegraphing and correspondence, as your own records will show. * * *

"Q. You thought enough of them to submit the bonds to them and Mr. O'Neil went to New York to get their opinion? A. Yes, sir.

"Q. To consult them? A. Yes, sir."

Mayor Sherman testified: "Q. You say this was a very extended discussion. Mr. Sutherlin explained, did he not, that Mr. O'Neil was in New York endeavoring to handle the matter at that time? A. I do not recall that he did, Major Burges. However, he may have."

We cannot agree with the conclusion drawn, from the above quoted evidence, by appellant.

In the first place it is clear we think that Sutherlin was doing nothing toward performing any duty imposed by the contract upon appellant, but was engaged, at most, in an attempt to persuade the city authorities to enter into a more favorable contract with appellee.

According to O'Neill's testimony he was in New York to secure, if possible, a formal opinion from Thomson, Wood & Hoffman, as to the validity of the first installment of bonds and to ascertain their attitude as to the validity of the second installment.

This was clearly not the performance of any contract duty to appellee but, at most, was in furtherance of an investigation of the legality of the two installments of bonds, a matter which was peculiarly important to appellant, but with which appellee was not concerned.

If appellant had decided to purchase the bonds without the approval of any attorneys, appellee could not have refused to consummate the sale by reason of that fact. It therefore follows that there was no evidence before the court to show that appellant, at the time the alleged declaration of intention to abandon the contract was made, was engaged in the performance of any of its contractual duties.

In view of the above conclusion, we are next confronted with the question of whether appellant's intention to abandon the contract was declared in positive terms and was unconditional.

It appears from the evidence that Mr. Sutherlin, representing appellant, discussed with the city authorities on different occasions the matter of the making of a new agreement between the city and his company relative to the purchasing of the bonds. He came to El Paso on October 29, 1931, and called upon the mayor, who called in the city attorney, Mr. McBroom, and the chairman of the finance committee, Mr. Rosenfield. The mayor's testimony as to what transpired at that meeting is:

"Q. Now, what, if anything, did Mr. Sutherlin say with reference to those bonds, that $1,500,000.00 bond issue? A. He said, 'Mr. Sherman, I presume you know the condition of the bond market, that it has gone to pieces,' speaking of the general financial condition of the country, he said he was out

here to see about the bonds. That the simplest thing for the Ulen Securities Company to do would be to kiss their $15,000.00 goodbye, and forget about the transaction, but he did not desire to do that and was here to discuss it.' I then put to Mr. Sutherlin the direct question: 'Do I understand that you are not willing to go through with the deal?'

"Q. What did he say to that? A. His reply was: 'It is not so much a question of being unwilling but we are not able to go through, the loss will be too great.' I then asked him the question, the direct question: 'Are you going to reject your account?' His reply was:—I remember these words, he says: 'We have a right under our contract to forfeit the $15,000.00 as liquidated damages.'

"Q. Did you have any other conference with him that day? A. At the same time, immediately I asked the City Clerk to call for the City Attorney, and Mr. Rosenfield, chairman of the finance committee. When they arrived I stated to them: 'Gentlemen, we have bad news, this man—'

"Q. Who was present, was Mr. Sutherlin still there? A. Mr. Sutherlin, I meant Mr. Sutherlin when I specified, 'this man.' I said: 'Gentlemen, we have bad news, Mr. Sutherlin is here to tell us the bond market has gone to pieces, and the company is not willing to buy the bonds under the contract.'

"Q. What did Mr. Sutherlin say to that? A. I do not recall that he made any reply to that statement; he repeated in substance to the City Attorney and Mr. Rosenfield what he told me of the loss involved under his contract."

Mr. Rosenfield's version of what occurred there, is:

"Q. Did Mr. Sutherlin himself make any statement in reference to the fulfillment of that contract? A. He did.

"Q. What statement did he make? A. As I came into the office Mr. McBroom was sitting there, and Mr. Sherman and Mr. Sutherlin, and the Mayor said: 'Well, I have got some bad news for you, the Ulen Securities Company are not going through with their contract on the bonds," and I was very much surprised, and we started to talking about the financial condition of the country, and the condition of the bond market at the time. I asked him—

"Q. Asked whom? A. Mr. Sutherlin, whether he was going through with the contract, and he said they would like to go through with the contract, but 'we cannot go through on the basis of the other contract.' "

As to this meeting Mr. McBroom said:

"Q. Did Mr. Sutherlin in that conference make any statement in reference to these bonds or this contract? A. Yes, sir.

"Q. What statement did he make Mr. McBroom? A. I believe I went in just a few minutes ahead of or just about the time Mr. Rosenfield came in, and Mr. Sherman, when Mr. Rosenfield came in, said: 'We have got bad news for you,' he says: 'that the Ulen Securities Company is not going through with their contract to purchase the bonds,' he said, as well as I recall it, 'Mr. Sutherlin can explain it to you.' Then he discussed generally the condition in the bond market. I believe we all agreed we had never seen such a financial condition, and he said it was absolutely legal for them to take the loss, and they would have to take it, it would be much better for them to give up their $15,000.00, that is the limit of their liability, and I says: 'Does the Ulen Securities Company back out of every agreement where they take a loss?' and he says: 'these are not ordinary times you must remember, I am representing stockholders like you are representing the City of El Paso. It would be very unjustifiable for us to take a loss of a hundred thousand or hundred and fifty thousand dollars when our legal liability is only to the extent of $15,000.00.'

"Q. When the conference was over where did you go? A. I believe I left the court house, and Mr. Sherman and Mr. Sutherlin were talking about this matter.

"Q. Left the Court house? A. I mean left the City Hall. I stated to Mr. Sutherlin: 'It is sure hell on the city if you won't go through with this contract,' he says: 'We can not—

"A. He said: 'Well, it is impossible for us to go through with the contract unless the City makes a big concession, and the banks kick in.' "

There appears to have been another conference about the matter in the director's room of the State National Bank, on October 31, 1931, at which were present: Mayor Sherman, Mr. Rosenfield, Mr. McBroom, Mr. Flory of the State National Bank, Mr. Young, of the El Paso National Bank, W. H. Burges, Aldermen Galbraith and Casteel, and Mr. Sutherlin. Mayor Sherman testified relative thereto:

"Q. Did you have any conversation at that time, any further conversation with Mr. Sutherlin, with reference to the contract entered into between the City and Glaspell, Veith & Duncan, in connection with the purchase of the $1,500,000.00 bonds, which contract was assigned to the Ulen Securities Company? A. We did.

"Q. What conversation took place at that time? A. Very extended. The substance of it was Mr. Sutherlin advised us, as he had advised the entire gathering at the City Hall previously, that the loss was too great, that the company could not and would not go through with the purchase of the bonds under our contract.

"Q. Did he make any statement with reference to what they meant by willing to do it? A. That if we could work out a higher rate of interest for the bonds they might be willing, or the company would be willing to go ahead and purchase them on a different basis.

"Q. After that conference—was there anything said at that conference, or at the termination of that conference, with reference to whether there would be a further conference with Mr. Sutherlin? A. No, sir.

"Q. Nothing at all? A. Nothing at all."

The examination of Mr. Rosenfield was as follows:

"Q. Did Mr. Sutherlin at that conference make any statement in reference to that contract? A. He did.

"Q. What did he say? A. As I recall he said: 'We might as well kiss our $15,000.00 good-bye rather than to go through with this contract.'

"Q. At the end of that conference was anything said about a future conference? A. None that I know of."

Mr. McBroom testified:

"Q. Did Mr. Sutherlin make a statement at that conference with reference to this conference? A. Yes, sir.

"Q. What did he state? A. He stated that they could not go on with the contract, that was impossible, would be out of all proportion to their legal liability, which would be $15,000.00, and a little later on he used the words, when we were insisting he go through with his contract: 'That the best thing for them to do was to kiss their $15,000.00 good-bye.' My recollection is Mr. Flory said: 'Then you are not going through with the contract?'

"A. Mr. Flory says: 'Do you mean to say you are not going through with this contract?' He says: 'It is impossible on the same contract,' and Mr. Flory says: 'I guess that is all there is for us to do', Mr. Sutherlin says: 'Hold on, let's see if we can make some agreement on new terms to work this thing out satisfactorily, this was too quick a time.'

"Q. Was there any further conference? A. No."

Mr. Young, of the El Paso National Bank, testified:

"Q. Will you state what statements were made by Mr. Sutherlin in reference to that contract there that afternoon? A. Mr. Sutherlin announced that in view of the condition of the bond market at that time that the bonds could not move at the price they were purchased at."

"Q. Did he say anything else in reference to the contract? A. He said he would rather kiss the money good-bye than to attempt to take up the bonds and probably stand a hundred thousand dollar loss, words to that effect."

While it is true that Mr. Sutherlin's version of the conferences he had with the city authorities contradicts the above statements and is to the effect that no final decision was reached, yet, we are of the opinion that the above-quoted testimony was sufficient to support a finding that appellant had declared definitely and unconditionally its intention to abandon the then existing contract.

From the whole record it appears to be clear that Mr. Sutherlin came to El Paso for the purpose of securing from the city authorities a more favorable agreement and with the intention, if such an agreement could not be secured, to forfeit the $15,000.

If we be correct in the above conclusion, then, unless there was some error committed in the trial of the cause which calls for a reversal of the judgment, it should be affirmed.

Appellant by several assignments further contends that the court erred in rendering judgment against it because the earnest money was forfeited by appellee at a time when it was without right, power, or authority to legally issue the bonds it had contracted to sell; at a time when no part of them had been approved by the attorneys for appellant; at a time when all the issue had not been approved by the Attorney General of Texas; at a time when the holders of the scrip had not tendered to it agreements to repurchase in the event its attorneys should fail to approve the whole issue; and at a time when no election had been held authorizing the issuance of the bonds.

It further contends that the city was without power to issue the bonds because of the unconstitutionality of the Bond and Warrant Law under which they were attempted to be issued.

In the agreement entered into and especially in that portion relative to the earnest money check, which has been heretofore quoted, appellant's right to a return of the check was, by their own proposal, made to depend upon the disapproval by its attorneys of the legality of the bonds. The matters complained of, if true, would certainly justify appellant's attorneys in refusing to approve the bonds, but under the above agreement are not matters which would relieve appellant from the effect of its declared intention to abandon the contract.

The exhibits excluded and the argument of counsel, which the court instructed the jury to disregard, related to the above matters, and the court properly excluded the exhibits and properly instructed the jury to disregard the argument.

The judgment of the trial court is affirmed.