DIAMOND LUMBER CO. *v.* ANDERSON.

1. LOGS AND LOGGING — CONTRACTS — BREACH — ADVANCEMENTS — RESCISSION.

> In a suit by the buyer for the specific performance of a contract for the sale of logs, where defendants were to install a spur track for the use of both parties, but no provision was made as to how it should be installed, the fact that defendants so installed it that it would be more beneficial to them than to plaintiff would not justify it in withholding advancements due under the terms of the contract, and on its failure to make such payments defendants were justified in returning the payments already made and rescinding the contract.

2. SPECIFIC PERFORMANCE—SALES—BREACH OF CONTRACT—REMEDY —EQUITY.

> Where a lumber company entering into a contract for the purchase of logs had been a going concern for a long time, and there is nothing to indicate that its status was changed any more because of the making of said contract than it would have been by the purchase of any other logs of like quantity, its remedy for breach of the contract is upon the law side of the court rather than in a suit for specific performance.

Appeal from Ontonagon; Driscoll (George O.), J. Submitted June 22, 1921.  (Docket No. 1.)  Decided October 3, 1921.

Bill by the Diamond Lumber Company against Robert E. Anderson and Edward T. Corwin, copartners as Anderson & Corwin, and another for specific performance of a lumbering contract.  From a decree dismissing the bill, plaintiff appeals.  Affirmed.

On right to rescind contract because of anticipated inability of other party to complete the same within the time limit, see note in 41 L. R. A. (N. S.) 60.

*Charles M. Humphrey* (*Samuel H. Cady,* of counsel), for plaintiff.

*Walter G. Van Slyck* (*John J. Walsh,* of counsel), for defendants.

MOORE, J. This is a bill of complaint filed to compel the specific performance of a contract. From a decree dismissing the bill of complaint the case is brought here by appeal. At the outset we cannot do better than quote freely from a carefully prepared written opinion filed by the chancellor before whom the case was tried. We quote:

"The plaintiff before and in 1919 was engaged in operating a large saw mill at Green Bay, Wisconsin, as well as in logging operations at a place called Camp Tolfree, on the White Pine branch of the Chicago, Milwaukee & St. Paul Railway, in Ontonagon county, Michigan. It had a large logging equipment at Camp Tolfree, including a locomotive engine and log loaders. Its saw mill plant and business conditions at Green Bay were and are such that it cannot store many logs near its mill. It was and is required to so arrange that a continuous flow of logs will arrive at its mill throughout the year. These logs are shipped in by rail and plaintiff's practice has been to procure its logs at such places that it would not have to depend on one railroad for its mill supply. It can better control the supply of logs for its mill if it, itself, loads its logs onto the railroad cars for shipment. It owns considerable standing timber on the White Pine branch and employs in its camps there from 100 to 250 men; but most of its timber is so situate that it cannot very well be shipped during the winter months when the snow is deep. In the spring of 1919 it was short of a supply of hemlock logs which it needed to fill its orders. The Chicago, Milwaukee & St. Paul Railway runs from Green Bay to Camp Tolfree, and the freight rate is very favorable for the shipment of logs from the White Pine branch to plaintiff's mill. The defendants, Anderson and Corwin, of Ontonagon, Michigan, in said spring, purchased a

tract of mixed timber, consisting of nine forties and about three million feet of logs, located near Camp Tolfree or the White Pine branch. This timber ran strong to hemlock, was of a kind and character needed by plaintiff in its saw mill business, was so located that it could use its log loaders and locomotive, kept at Camp Tolfree, to load and move it after it was hauled to the track and that it could be shipped for use at its mill when it would be difficult (if not impossible) to get its log supply from its own holdings on the White Pine branch. By reason of these and other facts this timber was very desirable for use at plaintiff's saw mill. Mr. Phillips, residing at Green Bay, Wisconsin, was plaintiff's general manager and treasurer, and Mr. Boyd, residing at Ontonagon, or at Camp Tolfree, Michigan, was its woods superintendent and had charge of its affairs on the White Pine branch.

"On or about May 24, 1919, Mr. Corwin, of Anderson & Corwin, went to Green Bay and there met Mr. Phillips, representing plaintiff, and made a deal with him for the sale by Anderson & Corwin to plaintiff of this three million feet of timber, as a result of which a contract in writing was entered into between plaintiff and Anderson & Corwin, which reads as follows:

" 'This agreement, made in duplicate this day, May 24, 1919, between R. E. Anderson and E. T. Corwin of Ontonagon, Michigan, party of the first part and the Diamond Lumber Company of Green Bay, Wisconsin, party of the second part.

" 'The first parties agree to sell and the second parties agree to buy a quantity of logs recently purchased by the first parties, consisting of nine forties in sections 23, 25, and 26, 51-41, estimated at three million feet more or less. It is agreed that the first parties are to make delivery of said logs decked in roll-ways along the Chicago, Milwaukee & St Paul right-of-way, same being the proper distance away from the present rails of the track and not more than 110 feet from the same, or along a spur track which is to be put in by said first parties before September 1st, 1919. * * *

" 'The timber is to consist of the following estimated amounts: * * *

" 'All logs are to be cut in a workmanlike manner, hemlock where necessary to be long butted. All hardwood logs are

to be 10-inch and up in diameter; 12, 14 and 16 feet lengths, with a strong percentage of 16 feet, with the exception of a very small per cent. of 10 feet if necessary to conserve the timber.   It is also agreed that a small per cent. of hardwood logs if straight and smooth be taken down to 8 inches.

"'All softwood logs are to be 8 inch and up except a small per cent. of smooth and straight will be taken down to 6 inch.   The lengths of the spruce, cedar and pine to be 12, 14 and 16 feet with as many 16's as it is possible to make without waste of timber.   The lengths of the hemlock to be 12, 14, 16 and 18 feet, cutting first as much of the 18 feet as possible, the balance strong to 16 feet.   For such logs so decked, said second parties agree to pay first parties per thousand feet: * * *

"'It is further understood that hemlock logs suitable for peeling, cut after November 15th and before April 1st and decked in roll-ways separate from the other mixed logs, the said second parties agree to pay $2 per thousand feet more than the above named prices.

"'It is understood that the said second parties expect to place one of their loading machines at this operation during the winter, in all probability about the holidays, and will no doubt, load out many of these logs as they are brought in to the landing, saving the first parties the expense of decking the same where possible.   In that case the logs will be scaled as put upon the cars.

"'The said second parties further agree to pay said first parties $2,000 advance June 1st; $2,000 June 15th, providing the first parties have $1,000 worth of logs decked at the roll-ways, $2,000 July 1st.   After sufficient logs have been decked as specified in this contract to cover these advances, the said second parties agree to pay upon the 10th of each month for all logs so delivered the previous month.' * * *

"The record does not show any of the conversations had between Mr. Corwin and Mr. Phillips while negotiating this deal, except that Mr. Corwin testified that he, Mr. Corwin, told Mr. Phillips at the time the deal was being made that Anderson & Corwin needed the advances provided for in the contract; also that he told Mr. Phillips at that time that they (Anderson & Corwin) were figuring on putting in the spur track mentioned in the contract in the way and at the place they afterwards actually did, and that Mr. Phillips

replied to this that if they did so he would have Mr. Boyd connect it up.

"The contract was executed and the $2,000 advance paid by plaintiff to Anderson & Corwin before June 1st, and Anderson & Corwin commenced to work at building camps, making roads, cutting and swamping logs, and building a narrow gauge railway for use in getting out the timber. Mr. Phillips had instructed Mr. Boyd to keep his eye on their operations and was satisfied that they were in good faith proceeding to carry out their part of the contract, when on June 13, 1919, he, for plaintiff, wrote Anderson & Corwin as follows:

" 'June 13, 1919.

" 'ANDERSON & CORWIN,

" 'Ontonagon, Mich.

" '*Gentlemen:* Will you kindly advise us what you have done regarding the decking of logs at the track, as next week will be time for further advances upon your contract. Have you got the scaler at work? Kindly give us what information you can by return mail.

" 'Yours truly,

" 'DIAMOND LUMBER COMPANY,

" 'JTP/S                 By......................'

"On June 16, 1919, Anderson & Corwin, through Mr. Corwin, replied as follows:

" 'June 16, 1919.

" 'DIAMOND LUMBER CO.,

" 'Green Bay, Wis.

" '*Dear Sirs:* We have your letter the 13th; no, we have not got the scaler at work yet, we will start to skid the last of this week or first of next, we have been laying our narrow gauge track, which is the way we will take out one eighty.

" 'We have between four and five thousand logs cut and swamped and roads all cut as well as landings at track, this on 80 acres.

" 'We did not understand that you expected we were going to make any report of logs decked until after the first of July. If there is any further information you would like advise us, we beg to remain,

" 'Yours very truly,

" 'ANDERSON & CORWIN,

" 'By E. T. CORWIN,'

"On June 19, 1919, plaintiff through Mr. Phillips replied as follows:

"'June 19, 1919.

"'ANDERSON & CORWIN,

"'Ontonagon, Mich.

"'*Gentlemen:* We have your letter of the 16th. We were more interested in finding out if you have any logs decked along the railroad, than anything else. We believe our contract provides for our making certain payments providing you had them out there. It is evident from your letter that you are not in need of additional money at this time but the next $2,000 would be payable July 1st. Unless we hear from you to the contrary we will send you $2,000 at that time.

"'Yours truly,

"'DIAMOND LUMBER COMPANY,

"'JTP/S          By J. T. PHILLIPS.'

"On June 24th defendants caused the following letter to be sent to plaintiff:

"'June 24, 1919.

"'THE DIAMOND LBR. CO.,

"'J. T. PHILLIPS.

"'*Dear Sir:* The writer was requested by E. T. Corwin who is in the woods to write you the following answer to your recent letter. Mr. Corwin showed your letter to Mr. Anderson and he said the contract called for $2,000 to be paid by June 15th. Mr. Corwin also said you would receive a full report of logs by July 1st. By June 25th they expect to start skidding.

"'Trusting this is satisfactory,

"'CORWIN & ANDERSON.

"'Mr. Corwin hoped you could send check by return mail.'

"On June 25, plaintiff, through Mr. Phillips, replied as follows:

"'June 25, 1919.

"'ANDERSON & CORWIN,

"'Ontonagon, Mich.

"'*Gentlemen:* We have your letter of the 24th. Do not know who it was written by. We are enclosing our check for $2,000 as requested. We believe the contract states that we were to pay $2,000 June 15th, providing you had that amount

of logs decked at the railroad track.  We would be glad to see you begin to get the logs to the track.

"'Yours truly,

"'DIAMOND LUMBER COMPANY,

"'JTP/S                              By......................'

"Plaintiff's letters just quoted were written at Green Bay and Anderson & Corwin's at Ontonagon. While this correspondence was being carried on Anderson & Corwin were engaged in putting in the spur track provided for in the contract.  All of the other spur tracks on this White Pine branch (which was quite generally down grade from Camp Tolfree to Ontonagon) had been put in so as to connect with the C. M. & St. P. tracks at the north end; but Anderson & Corwin, in good faith and as a measure of economy and convenience to themselves, in getting out their logs and bark and handling supplies, were putting in this spur (which was between Camp Tolfree and Ontonagon) so as to connect with the C. M. & St. P. tracks at the south end.  This would somewhat increase the danger of taking loads of logs out of the spur and would not be as convenient for plaintiff's use in getting out the logs as if connected as the others were.  This element of danger and inconvenience could be avoided by putting in another track so as to form a wye or by putting in a passing track. Mr. Boyd, having observed or learned how they were putting in this spur, spoke to Mr. Corwin and objected to the way they were putting it in.  Up to this time Mr. Boyd did not know anything about Mr. Corwin's talk with Mr. Phillips concerning the spur, but Mr. Corwin then told him about it.  Not getting a satisfactory answer from Mr. Corwin as to whether or not they would change the spur, and deeming it best to put the matter in writing, on June 19, 1919, Mr. Boyd wrote Anderson & Corwin, from Ontonagon the following letter:

"'Main Office and Mills:  Green Bay, Wis.

DIAMOND LUMBER COMPANY.

Woods Department.

"'Ontonagon, Mich., June 19, 1919.

"'MR. E. T. CORWIN,

"'Ontonagon, Mich.

"'*Dear Sir:* We have been thinking quite a little about your

proposed railroad at your camps and unless you put in a connection from the north end and connect up with your present proposed track, forming a wye, we will have to refuse to go in there on account of the switching, as we are compelled to keep our engine on the north end of the loads at all times.

" 'We understand you are busy loading out logs at Ontonagon and as soon as you can arrange we would like to meet you at your camps and try to arrange the R. R. tracks satisfactory to you and the Diamond Lumber Co.

" 'Yours truly,<br>
" 'DIAMOND LUMBER COMPANY,<br>
" 'By E. H. BOYD,<br>
" 'Woods Supt.'

"Anderson & Corwin kept on with their work and apparently made no written reply to plaintiff's last mentioned letter, but Messrs. Boyd and Corwin subsequently met and talked about it, during which Mr. Boyd still insisted on the change.    Later and between July 6th and July 10th (the exact time is not certain), Mr. Phillips made a three days visit to Camp Tolfree and vicinity.    During this visit he met and had several talks with Mr. Corwin and also went over to the spur track in question with Anderson & Corwin's foreman, Mr. Russell.    This spur track was about 4,400 feet long.    During these talks with Mr. Corwin the spur track was discussed, during which Mr. Phillips endeavored to compromise the matter. Concerning this he testified:

" 'Q. Was anything said about the way the spur track should be built?

" 'A. Oh, yes, quite a little.

" 'Q. That is what I want to know, just state what that was, what conversation you had with him about that.

" 'A. We objected to that way of putting in the spur.    We wanted it to lead in as the other spurs along the line did and couldn't see any reason for their going in there as they proposed.

" 'Q. Did you state that to Mr. Corwin?

" 'A. Yes, sir.

" 'Q. What did he say about it?

" 'A. Mr. Corwin isn't a man that says very much of anything. You can never get him to commit himself in any way.

" 'Q. Did he say anything about it?

" 'A. He didn't say he would or he wouldn't, as I recollect it,

but he didn't intimate that they were going to change their plans in any way.

" 'Q. Did he at any time say anything to give you any reason to believe that Anderson & Corwin weren't going ahead, and carry out their contract with you?

" 'A. Well, I don't know that he did. I would say that when I was at the back end of that spur with Mr. Russell, their foreman, he told me that—'

"Here witness was interrupted. Later he testified:

' " 'Well, later the next day, I think it was, when we were trying to get them to build the track so that it would be what we considered serviceable, I offered to switch their cars of bark without charge while we were loading logs, providing they would put the other piece of track in or change the track around. I offered to bring them some steel down that I understood they owned up at White Pine Junction.

" 'Q. Now why did you offer to do that when Mr. Corwin brought this matter up?

" 'A. Well, I was trying to do everything I could to hold the logs. * * * My proposition was made to him and he agreed to take it up with Mr. Anderson and advise me what they concluded to do. * * * I never had any talk with Mr. Anderson on this contract whatever.

" 'Q. What was the result of your conversation with Mr. Corwin on the 9th or 10th of July, as to what he would do?

" 'A. He stated he would talk it over with Mr. Anderson and advise us.

" 'Q. And did he advise you?

" 'A. No, we never heard anything from him about that part of it.

" 'Q. Did he make any report to you as the result of that talk with him?

" 'A. No, sir.'

"It is undisputed that plaintiff wanted Anderson & Corwin to change the spur, or put in a wye or passing track at their expense and that it would cost somewhere around $700 to do this. While Mr. Corwin in his testimony admitted that he told Mr. Phillips, in the July conversation, that he would go back and talk the matter over with Mr. Anderson and let him (Mr. Phillips) know, he testified on cross-examination by plaintiff's counsel, as follows:

" 'Q. On the 10th of July Mr. Phillips didn't tell you that he wouldn't go ahead with the contract if you didn't change that spur, did he?

" 'A. No, I don't think so.

" 'Q. When you left him on the 10th of July you fully expected to go ahead and carry out the contract didn't you?

" 'A. I think that evening we met down here, I told him we certainly wouldn't spend money to change that track.

" 'Q. When you left him at that time they didn't say they wouldn't go ahead and carry out their part of the contract and you fully expected and intended to go ahead and carry out your part of the contract?

" 'A. I fully made up my mind and told him that we wouldn't spend any money to change it.'

"At the first time Mr. Anderson had anything to do with the attempted rescission of the contract he told Mr. Corwin that if he (Corwin) couldn't agree with Mr. Phillips (that if Mr. Phillips was 'unreasonable') they would try and rescind the contract and sell the logs to somebody else.

"No $2,000 advance payment was made by plaintiff on July 1st, or after June 25th. When Mr. Phillips was at Camp Tolfree, Mr. Corwin referring to this, told him he thought they had some more money coming. Mr. Phillips' only reply to this was that he 'didn't care anything about that part of it.' The conversation then turned to the subject of the spur track. Mr. Corwin thought he was going to send the money. Mr. Phillips returned to Green Bay and from there sent to Mr. Corwin some money which plaintiff owed Corwin (not Anderson & Corwin) on another matter but did not send the $2,000 for the July 1st advance to Anderson & Corwin. Thereupon Anderson & Corwin through Mr. Corwin, under date of July 12, 1919, wrote plaintiff as follows:

" 'July 12, 1919.

" 'DIAMOND LUMBER CO.,

" 'Green Bay, Wis.

" '*Dear Sirs:* Inasmuch as you seem to be dissatisfied and have not made your payments according to contract we have concluded to send back what money you have paid, amounting to $4,000 and you should find our check enclosed.

" 'Further you said to the writer and our Mr. Russell that

you would not accept our spur as we have it laid out.   We
have not been in the habit of doing business in this manner,
it is very evident to us that you want to break the contract and
do not want the logs.

  " 'The essence of the contract was that you advance us certain
money, which you have not done, so we figure we haven't any
contract with you anyway.   Not receiving the money as agreed
has placed us in a very embarrassing position.   Kindly advise
receipt of check and oblige.

" 'Yours truly,

" 'ANDERSON & CORWIN,

" 'By EDW. T. CORWIN.'

  "July 15, 1919, plaintiff through Mr. Phillips re-
plied as follows:

" 'July 15, 1919.

" 'ANDERSON & CORWIN,

  " 'Ontonagon, Mich.

  " '*Gentlemen:*   We acknowledge receipt of your letter of the
12th and are herewith enclosing your order as we have no idea
of releasing you of your contract with us upon these logs.

  " 'We are not so much surprised at the receipt of this letter
as the writer was of the opinion that you did about everything
you could last week while I was there to get me to cancel the con-
tract.   It is very evident to us that you are doing your utmost
to be released from the contract, but we have no idea of re-
leasing you.

  " 'You say we have not made payments according to the con-
tract.   We would call your attention to the fact we sent you
$2,000 before June 1st.   The contract provides that we are to
send you $2,000 June 15th, providing you have $1,000 worth of
logs decked at the roll-ways.   You did not have them decked
at that time and in fact did not have them there by July 1st, al-
though we sent you another $2,000 about the 20th of June; we
haven't the exact date before us.   The contract further speci-
fies that after a sufficient number of logs have been decked cover-
ing these advances, that we agree to pay on the 10th of each
month for all logs so delivered the previous month, and unless
you notify us what the amount is, we are unable to pay you
anything further.   We have complied fully with our part of the
contract and intend to do so in the future and shall expect
you to do so also.

  " 'We were dissatisfied with the way that you have put your
  216—Mich.—6.

track in and why you should go ahead and lay .it out without saying something to our Mr. Boyd, who you expect will have to run over it, is beyond our comprehension. It is very plain to anyone that all of the spurs upon that line are put in leading toward the south and not toward the north. The writer before leaving Ontonagon last Thursday evening told you what we would do as a compromise and in so doing it would cost us more to handle your carloads of bark than it would you to put the switch in as we asked. The only thing for you to do is to get busy and live up to your part of the contract, and if we have not complied with our part of it, we are willing to leave it to the courts to decide.

" 'Yours truly,
" 'DIAMOND LUMBER COMPANY.

" 'JTP/S.'
(Dictated—not revised.)

"Afterwards under date July 23, 1919, Mr. Corwin with the assistance of counsel, replied to plaintiff as follows:

" 'July 23, 1919.

" 'THE DIAMOND LUMBER CO.,

" 'Green Bay, Wisconsin.

" '*Gentlemen:* Your favor returning our check for $4,000 at hand. I am returning same herewith, which will be honored and paid by the First National Bank of Ontonagon, at Ontonagon, Michigan, on demand.

" 'You have broken your contract dated May 24, 1919, with us, for the purchase of logs. You agreed to pay us an advance of $2,000 on July 1, 1919. You have not made this payment, and your letter of July 15, clearly states that you claim same should not be paid, and that the payment of $2,000 June 1st, and same amount June 20th is full compliance of your agreement as to advance payments.

" 'The contract provides that the logs shall be decked in rollways along the C. M. & St. P. right-of-way or along a spur track, connecting therewith. We have gone to the expense of building this spur, and you now claim you will not go on with the spur unless we build a "wye" in connection therewith. This is another breach of the contract and we hereby notify you that we now declare the contract rescinded, and this check is to return to you the amount of money we have received from you on account of the contract.

" 'If you do not care to receive the enclosed check we are

ready and willing and offer to pay you at once that amount of money, $4,000, which will place you where we found you.

"'Yours very truly,
"'ANDERSON & CORWIN,
"'By EDWARD T. CORWIN.

"'ETCE—Encl.'

"The price of logs had materially advanced at this time and Anderson & Corwin, through Mr. Anderson sold to defendant Spies-Thompson Lumber Company, under contract dated July 25, 1919, 'about three million feet of woods run logs' which although the contract does not so state, were apparently conceded at the trial to be the same logs here involved. On August 4, 1919, plaintiff, through Mr. Phillips wrote Anderson & Corwin as follows:

"'August 4, 1919.

"'ANDERSON & CORWIN,
"'Ontonagon, Mich.

"'*Gentlemen:* We are enclosing our check for the estimated amount due you as per our contract. We find that the average price as per the estimated amounts given us, is $18.30 per M. Mr. Corwin told the writer on Wednesday evening, the 3d, that you had about 275,000 decked at the track and that you were putting in 13,000 or 14,000 a day, so we have endeavored to figure very liberally with you on the amount you have there in making payment. Of course, it is up to you to notify us what the amount you have there is, but to protect ourselves, we are enclosing a check for the amount due.

"'On May 28th, we sent you $2,000 covering the first payment as per contract and on June 15th, you had not started to deck logs at the track, so there was nothing due you, and on June 24th we sent you $2,000 covering payment due July 1st. This is all in accordance with the terms of the contract.

"'We trust that you will very soon get the scaler on there to work, complying with your part of the contract, so that we may know what is being done. We should have our reports promptly the same as we always had them from Corwin & Riley.

"'Yours truly,
"'DIAMOND LUMBER COMPANY.

"'JTP/S.'

"Afterwards defendant Spies-Thompson Company began to ship out some of the logs and this bill was

filed on or about September 6, 1919.    The bill prays a decree for specific performance of the contract, an injunction to restrain the shipment of the logs and an accounting as to the logs delivered to and shipped by defendant Spies-Thompson Company.    Answer was filed praying affirmative relief, viz., that the contract of May 24, 1919, be annulled and held for naught. The case was heard upon pleadings and proofs.

"Questions Involved.    There are two main questions involved, viz., (a) Whether the contract in question is one a specific performance of which could in any event be decreed; and (b) Whether or not, if the court has jurisdiction, the proofs entitled plaintiff to a decree.

"(a) Both parties construe the contract in question to be one for the sale and delivery of personal property.    Defendants contend that this case is not properly brought in equity, because, they say, the plaintiff if wronged has an adequate remedy at law; and further, that the particular contract here involved is so vague, indefinite and uncertain in its terms that the court could not in any event decree specific performance of it, citing among other authorities, *Blanchard* v. *Railroad Co.*, 31 Mich. 43, and 6 R. C. L., p. 644; while plaintiff cites in opposition *Williamson* v. *Neeves*, 94 Wis. 656 (69 N. W. 806); *Bull* v. *Bell*, 4 Wis. 54; *Docter* v. *Hellberg*, 65 Wis. 415 (27 N. W. 176); *White Marble Lime Co.* v. *Lumber Co.*, 205 Mich. 634; *Dells Paper & Pulp Co.* v. *Lumber Co.*, 170 Wis. 19 (173 N. W. 317); *St. Regis Paper Co.* v. *Lumber Co.*, 186 N. Y. 89 (78 N. E. 701).

"There can, I think, be no doubt that this court has full jurisdiction of the subject-matter of this suit. The uniform sales act (3 Comp. Laws 1915, § 11899) provides:

" 'Specific performance.    Where the seller has broken a contract to deliver specific or ascertained goods, a court having the powers of a court of equity, may, if it thinks fit, on the application of the buyer, by its judgment or decree direct that the contract shall be performed specifically, without giving the seller the option of retaining the goods on payment of damages. The judgment or decree may be unconditional, or upon such terms and conditions as to damages, payment of the price and otherwise, as to the court may seem just.'

"But specific performance of a contract is not a matter of absolute right. It rests in the sound judicial discretion of the court. *McMurtrie* v. *Bennette,* Harr. Ch. 124; *Weed* v. *Terry,* 2 Doug. 344; *Smith* v. *Lawrence,* 15 Mich. 499; *Chambers* v. *Livermore,* 15 Mich. 381; *Rust* v. *Conrad,* 47 Mich. 449; *Chapman* v. *Morgan,* 55 Mich. 124; *Hicks* v. *Turck,* 72 Mich. 311. Where specific performance will remedy the breach more adequately than damages, it may be decreed. *Peer* v. *Kean,* 14 Mich. 354; 3 Comp. Laws 1915, § 11899. However it will not be decreed where continuous duties of regulation or supervision would rest on the court. *Bourget* v. *Monroe,* 58 Mich. 563; *Blanchard* v. *Railroad Co.,* 31 Mich. 43; *Voorhies* v. *Frisbie,* 25 Mich. 476; *Buck* v. *Smith,* 29 Mich. 166 (18 Am. Rep. 84). And the contract must be complete. No specific performance is granted where essential details are omitted. And the court will not decree specific performance of a part only of a contract, unless such part is clearly severable from the remainder. *Gates* v. *Gamble,* 53 Mich. 181; *Bourget* v. *Monroe, supra; Wardell* v. *Williams,* 62 Mich. 50; *Hall* v. *Loomis,* 63 Mich. 709; *Maynard* v. *Brown,* 41 Mich. 298; *Baldwin* v. *Fletcher,* 48 Mich. 604; *Wiegert* v. *Franck,* 56 Mich. 200; *Munro* v. *Edwards,* 86 Mich. 91; *Blanchard* v. *Railroad Co., supra.* As stated in the latter case:

" 'The jurisdiction of equity in specific performance proceeds on the supposition that the parties have not only agreed, as between themselves, upon very material matter, but that the matters so agreed on are of such a nature, and the subjects of enforcement so delineated or indicated, either directly or by reference to something else, or so raised to view by legitimate implication, that the court can and may collect, and in their proper relations, all the essential elements, and proceed intelligently and practically in carrying into execution the very things agreed on and standing to be performed.'

"See, also, *Wiegert* v. *Franck,* 56 Mich. 200.

"*Dells Paper & Pulp Co.* v. *Lumber Co.,* 170 Wis. 19 (173 N. W. 317), is clearly distinguishable from this case on the facts. There was a ten-year contract, quite specific in its provisions and made more specific and

certain by a three years' course of dealings thereunder by the parties.    (See *Engle* v. *White*, 104 Mich. 15.) *White Marble Lime Co.* v. *Lumber Co., supra,* is more in point than the *Dells Case,* but the contract there is also much more definite in terms and had been proceeded under for some time.    Each of the last mentioned cases, that is, the *Dells Case* and the *White Marble Case,* is clearly distinguishable from the case at bar in this: That here quite a satisfactory showing is made that there was other timber of like kind available (though at a higher price) in the vicinity where the logs in question were situated and the plaintiff made no effort of any consequence to get logs elsewhere, while in the other cases just mentioned it was quite conclusively proven that the very existence and continuance of the respective plaintiff's business depended upon their getting the very commodity which they sought the aid of the court to obtain.    I find it unnecessary in this case, however, to decide whether or not the terms of the contract are such that a decree for specific performance of the same could be entered.

"The undisputed testimony shows that the timber in question was, when the contract in question was entered into, recently purchased by Anderson & Corwin. Mr. Corwin testified:

" '*Q.* Now, when you entered into the contract with Mr. Phillips, or the Diamond Lumber Company, was there any peculiar feature regarding that deal that induced you to enter into the contract at those prices?    *   *   *

" '*A.* Yes, there was.

" '*Q.* What was that?

" '*A.* We needed the advances.

" '*Q.* Did you or did you not advise Mr. Phillips that you needed advances?

" '*A.* Yes, while we made the deal.

" '*Q.* And was that why it was entered into the contract that the advances should be made?

" '*A.* Yes, sir.'

"Mr. Phillips was sworn as a witness but did not (directly at least) deny this.    Mr. Corwin also testified without contradiction:

" '*Q.* When did you first talk with anyone about the way that

spur would be installed, the one that you agreed to install under the contract?

" 'A. Before we made the contract there was some talk about it.

" 'Q. With whom?

" 'A. With Mr. Phillips.

" 'Q. That is, that you were going to install a spur from which the cars were to be loaded?

" 'A. Yes, sir.

" 'Q. Was there anything said at that time as to how the spur would lead off?

" 'A. Yes, there was some talk about that too.

" 'Q. What was that?

" 'A. I think I made the remark that we figured to put the spur in at about that point on account of loading bark and it might lead that way.

" 'Q. You told him at that time?

" 'A. Yes, sir.

" 'Q. And what did he say?

" 'A. He said if we did he would have Mr. Boyd connect up from the other way.'

"Again, referring to his talk with Mr. Boyd before Mr. Boyd wrote the letter of the 19th, Corwin testified:

" 'He told me we were heading the spur the wrong way. I told him of my talk with Mr. Phillips. He didn't know anything about that part of it.

" 'Q. You told him about your talk with Mr. Phillips; that you had told Mr. Phillips you intended to head the spur in leading down grade instead of up grade off the track?

" 'A. I told him it might go in that way; we didn't know which way it would go in yet.'

"The written contract did not specify how the spur should be put in. The title to the logs was supposed to pass to plaintiff when the logs were scaled by a scaler chosen by both parties and decked at the track. Anderson & Corwin under the contract had nothing to do with the loading or hauling away of the logs. They put the spur in in good faith and in a way which was most beneficial to them. The spur as they put it in was serviceable as such. They were not (especially in view of what Mr. Corwin said to Mr. Phillips) bound to put the spur in in the way which would

be most convenient and beneficial to the plaintiff, and thereby render it less beneficial to themselves. It was staked out by the roadmaster of the railway company and was apparently satisfactory to the railway company. It was not put in as the blue print attached to the contract of the railroad company specified; but this contract and blue print was delivered to Anderson & Corwin long after the spur was laid out and staked out. Some objection was made by Mr. Bell, a C. M. & St. P. railway conductor who worked on the White Pine branch, but his authority to interfere in the matter is not made apparent. How far the work of constructing the spur had proceeded when Mr. Boyd first spoke to Anderson & Corwin about the matter is not clear, but undoubtedly they had then spent considerable money on it. When Mr. Boyd spoke to Mr. Corwin, Mr. Corwin told him of his (Corwin's) previous conversation with Mr. Phillips. Mr. Boyd did not until then know anything about this. Afterwards he wrote Anderson & Corwin the letter of the 19th. About twenty days thereafter Mr. Phillips had the talk with Mr. Corwin. He (although there is no showing that Mr. Corwin was aware of the fact) was then unaware that Mr. Boyd had written the letter of the 19th, because he testified:

"'*Q.* Mr. Boyd had written them, you knew, that you wanted a "Y"?

"'*A.* No. We both objected to the way they were putting the track in.

"'*Q.* Mr. Boyd asked for a "Y"?

"'*A.* I don't know about that.

"'*Q.* You don't know about that?

"'*A.* No.

"'*Q.* You thought a passing track should be put in?

"'*A.* We were trying to figure out the easiest way to handle it.'

"The testimony and correspondence shows that both Mr. Phillips and Mr. Boyd were of the opinion that it was the duty of Anderson & Corwin to consult Mr. Boyd and be governed by what he determined as to how the spur should be put in; but even if that duty existed under the written contract (a question I need not and do not determine), it certainly did not exist

in view of what Mr. Corwin and Mr. Phillips had said about the matter during the negotiations. According to that Mr. Phillips was to have Mr. Boyd connect the spur up if that was necessary. The spur if connected up would be just as convenient for plaintiff's use, and just as safe for everybody as any other spur on the branch. It is undisputed that plaintiff insisted that Anderson & Corwin should put in the wye, or passing track, at their own expense. The evidence shows that this would cost upwards of $700. This, especially in view of the fact that the price of timber had materially increased after the contract in question was made, was asking quite a little of Anderson & Corwin. I do not think the plaintiff was justified in taking the position it did with reference to this spur.

"Now, reverting briefly to the advance payment question. The contract provided that a $2,000 advance should be made (unconditionally), on June 1, 1919; that a further $2,000 advance should be made on June 15th, provided that at that time the sellers had $1,000 worth of logs decked, and that another $2,000 advance should be made (unconditionally) on July 1st. The June 1st payment was promptly paid. (See Exhibit 2.) Plaintiff's letter of June 13th called Anderson & Corwin's attention to the June 15th advancement. The provision that the sellers should have $1,000 worth of logs decked in order to become entitled to this advancement was evidently intended to insure plaintiff that the previous advance money would be expended towards the fulfillment of the sellers' part of the contract. Mr. Phillips' testimony shows that when he wrote the letter of the 13th he believed that the sellers were proceeding in good faith to carry out their part of the contract. Plaintiff had a right, at its option, to insist upon or waive the condition attached to the June 15th advancement (3 Comp. Laws 1915, § 11842). He had instructed Mr. Boyd to keep his eye on the work and was in a position to know what was going on at Anderson & Corwin's operations. The latter's letter of June 16th also showed what they were doing. They did not have the scaler at work (in fact it does not appear that the parties ever agreed on a scaler), and had not

started to skid; but they were laying a narrow gauge track, had between 4,000 and 5,000 logs cut and swamped and had roads all cut as well as landings at the track. They did not understand that plaintiff expected they were going to make any report of logs decked until after July 1st. Plaintiff's letter (written by Mr. Phillips) of July 19th, states:

> " 'We were more interested in finding out if you have any logs decked along the railroad than anything else. We believe our contract provides for making certain payments providing you had them out there.'

"Mr. Phillips apparently, was not certain of the contents of the contract at the time. Anderson & Corwin's reply dated June 24th, takes issue with Mr. Phillips on this belief. It states:

> " 'Mr. Corwin showed your letter to Mr. Anderson and he said the contract called for $2,000, to be paid by June 15th.'

"The postscript to this letter adds:

> " 'Mr. Corwin hoped you could send check by return mail.'

"Now, I think it is apparent that this postscript referred to the check due June 15th, and not the one due July 1st, or any other check. Mr. Phillips in reply says:

> " 'We are enclosing our check for $2,000 as requested,'

and he adds,

> " 'We believe the contract states that we were to pay $2,000 June 15th, providing you had that amount of logs decked at the railroad track.'

"The contract only required the sellers to have one thousand dollars worth of logs decked on June 15th. This contract was made by Mr. Phillips and Mr. Corwin. Anderson, personally had nothing to do with its making except to sign it. Corwin, on receiving Phillips' letter of the 19th, referred it to Mr. Anderson. Mr. Anderson said there was $2,000 due June 15th unconditionally. Corwin causes this statement to be made known to Mr. Phillips, who, apparently without taking the trouble to look at the contract and ascertain what it in fact provided, yielded and sent

the $2,000 'as requested,' with the parting shot that he still believed the contract required the logs to be decked on June 15th.   It is apparent that plaintiff did not regard the provision in question as material.   It would suffer no detriment by waiving the provision. Unless the plaintiff waived this provision it must be held that Anderson & Corwin forfeited the right to the June 15th advancement, which Mr. Corwin testifies they needed.   While a waiver of rights, and especially stipulated rights, is not to be implied from slight circumstances, a waiver will be assumed from slight circumstances when no substantial rights are lost thereby or to avoid a forfeiture.   *Bird v. Hamilton,* Walk. Ch. 361; *Gault v. Van Zile,* 37 Mich. 22; *Snyder v. Washtenaw Circuit Judge,* 80 Mich. 511; *Lyon v. Insurance Co.,* 55 Mich. 142.   Plaintiff in its letter of June 25th says: 'We would be glad to see you begin to get the logs to the track.' Anderson & Corwin did this.   They had over $1,000 worth of logs decked at the track on July 1st, when the third and last advance installment became due under the contract.   If the sellers had decked $1,000 worth of logs by June 15th, they would unquestionably have been entitled to a $2,000 advance on June 15th.   They would also under such circumstances, have been entitled to a further $2,000 advance on July 1st, even though they had not decked a single log after the 15th.   Therefore they were in exactly as good a position (in so far as the decking of logs was concerned) on July 1st, when the last advance payment fell due, as they had a right, under the contract, to be if the sellers strictly complied with the terms of the contract.   The provision that $1,000 worth of logs should be decked on June 15th was therefore waived. The advance payment due July 1st was never paid. Plaintiff breached the terms of the contract by its nonpayment.

"Having concluded that the July 1st advance payment has not been paid and that the plaintiff did not have the right to take the position which it did regarding the spur it remains to be determined whether or not either or both of these facts operated to release the defendants, Anderson & Corwin, from their

obligations under the contract and to justify them in refusing to deliver the logs.

"Plaintiff contends that defendant should not be released because it, the plaintiff, did not positively or unconditionally refuse to go on with the contract if the spur was not changed and that the failure to pay the July 1st advance, if that obligation existed, being done under misconstruction of the contract, was not such a breach as would operate to discharge the sellers, citing *St. Regis Paper Co.* v. *Lumber Co.*, 186 N. Y. 89 (78 N. E. 701) ; *Hardeman-King Lumber Co.* v. *Hampton Bros.*, 104 Tex. 585 (142 S. W. 867) ; *Kilgore* v. *Educational Ass'n*, 90 Tex. 139 (37 S. W. 598) ; *Brady* v. *Oliver*, 41 L. R. A. (N. S.) 60 (125 Tenn. 595, 147 S. W. 1135), and other cases. The uniform sales act of Michigan, 3 Comp. Laws 1915, § 11896, provides that:

" 'When seller may rescind contract or sale. Where the goods have not been delivered to the buyer, and the buyer has repudiated the contract to sell or sale, or has manifested his inability to perform his obligations thereunder, or has committed a material breach thereof, the seller may totally rescind the contract or the sale by giving notice of his election so to do to the buyer.'

"See, also, section 11892. This act was passed in 1913. In *Scheible* v. *Klein*, 89 Mich. 376, the plaintiff brought suit to recover a sum claimed to be due him under a verbal contract for the construction of a building. The contract price was $2,275. Plaintiff claimed the arrangement was to be that he was to get the money from the defendant at any time whenever he wanted it, except for the last $75. Defendant claimed she was to pay all but $75 at the completion of the job and the remaining $75 the following spring. Before completion of the building and after plaintiff had put about $1,400 of labor and material into it he asked defendant to pay him $1,000 that he might pay his men and for the material. Defendant refused, claiming she was not to pay till the building was completed, but offered plaintiff $200, which he refused to accept. Plaintiff then quit the job. On the trial the plaintiff claimed he quit the job for another reason; but defendant claimed he quit

because she refused to give him the $1,000 demanded.
The court, *inter alia,* said:

> " 'The plaintiff testified that all the money except the $75
> was to be paid as the work progressed, and that he told the
> defendant at the time the contract was made that he must have
> his money as the work progressed to pay his men and to pay
> for the lumber; and that defendant then stated to him that
> he should have his money whenever he wanted it.   It also
> appeared upon the trial that at the time when plaintiff de-
> manded the $1,000, the sum of $1,400 and upwards was due,
> and that the amount for lumber, material and labor exceeded
> the $1,000 which he demanded. * * * We think that under
> the contract as claimed by plaintiff the court might properly
> have said to the jury that, if they found the contract as plain-
> tiff claimed, then upon the refusal of the defendant to pay the
> $1,000 plaintiff was justified in quitting the job.'

"See, also, *Town* v. *Jepson,* 133 Mich. 673.   We have
not here a case of failure to pay for an installment
of goods.   This breach affected the entire contract.
It went 'to the root of the matter' as the old cases
say.   The withholding of such an amount of money
has often ruined contractors and jobbers like these.
The testimony shows that the sellers in this case at
the time the contract was made, were induced to enter
into the contract at the price they did because they
needed advances; that they advised plaintiff that they
needed the advances; and that that was why it was
provided in the contract that the advances should be
made.   This is undisputed.   The testimony of Mr.
Corwin is not very clear and positive that he demanded
the July 1st payment of Mr. Phillips when Mr. Phil-
lips was at Camp Tolfree.   He simply says that he
called Mr. Phillips' attention to it and said he thought
they had some money coming and that Mr. Phillips'
only reply was that he 'didn't care anything about
that.'   Corwin does not say Mr. Phillips refused to
pay the money then.   On the contrary he says he
thought he would send it when he got back to Green
Bay.   But when Mr. Phillips went back to Green Bay
and sent on the other money without paying this,
then Mr. Corwin evidently changed his mind and
wrote, in his letter of July 12th, containing the follow-
ing: * * * 'you seem to be dissatisfied and have

not made your payments according to contract   *   *
*   The essence of the contract was that you advance
us certain money, which you have not done, so we
figure we haven't any contract with you anyway.   Not
receiving the money as agreed has placed us in a very
embarrassing position.'   Plaintiff in its answer took
the positive position that it was not obliged to pay
this because it paid the $2,000 about June 20th, and
states: 'We have complied fully with our part of
the contract' and later 'if we have not complied fully
with our part of it, we are willing to leave it for the
courts to decide.'   Again on July 23, 1919, the sellers
(or Mr. Corwin for them), with the assistance of coun-
sel, wrote plaintiff calling  its attention to these two
breaches and giving notice of rescission because of
them, and plaintiff in its letter of August 4th replied:

. " 'On May 28th, we sent you $2,000 covering the first payment
as per contract and on June 15th you had not started to deck
logs at the track, so there was nothing due you, and on June
24th we sent you $2,000 covering payment due July 1.   This
is all in accordance with the terms of the contract.'

"Anderson & Corwin, if they have ever done so, did
not put it out of their power to fulfill their part of
this contract until about July 25th.   The situation
was unchanged except as to the sellers' notice of re-
scission.   It could have, up to that time, retracted
its refusal to go on with the contract and gone on with
the same.   9 Cyc. p. 637; *Wigent* v. *Marrs*, 130 Mich.
609.   Plaintiff's letter of August 4th indicates that it
did not even then know that they had resold the logs.
It did not deny when Corwin orally referred to the
matter that it did not owe the money.   If Mr. Cor-
win's oral request before July 12th was not a sufficient
demand for the money his letter of the 12th certainly
made it incumbent upon plaintiff to pay this advance
if it did not desire to suffer the consequences of a re-
fusal to pay the July 1st advance.   In *Scheible* v.
*Klein, supra,* the court said:

" 'In *Grand Rapids, etc., R. Co.* v. *Van Dusen,* 29 Mich. 431, it
was held that continued and repeated defaults in payment ac-
cording to the provisions of the contract justified the contract-
ors in abandoning the work before completion.'

"Plaintiff could not on July 15th or on August 4th withdraw its waiver of the condition annexed to the June 15th advance. It did not attempt to do so when Mr. Corwin orally requested the money. The failure to pay the July 1st advance must be held to have been a material breach of the contract. *Scheible* v. *Klein, supra; Grand Rapids, etc., R. Co.* v. *Van Dusen, supra.*

"The written contract is silent as to how or where the spur should be put in. The only oral testimony regarding such subject is, in effect, that when the written contract was made plaintiff was told by Mr. Corwin that they might put it in at the place and in the manner which they actually did put it in—that they had not yet decided upon the matter—and that plaintiff replied that if they did so it would connect it up. Instead of doing so plaintiff endeavored to get Anderson & Corwin to do so at their own expense. Mr. Corwin told Mr. Boyd of the original talk with Mr. Phillips when Mr. Boyd first spoke to him. This is undisputed. Yet plaintiff wrote Mr. Corwin on June 19th:

" ' * * * Unless you put in a connection from the north end and connect up with your present proposed track forming a wye we will have to refuse to go in there on account of the switching as we are compelled to keep our engine on the north end of the loads at all times.'

"Mr. Boyd afterwards orally substantially reiterated the demand made in this letter. It is true that the same letter suggested a meeting to arrange the matter satisfactorily to both parties, and that Mr. Phillips afterwards suggested a passing track in place of the wye and offered to haul bark and railroad iron, in consideration of Anderson & Corwin doing this work. But, as before stated, it would cost a considerable sum to make the change. The installation of a switch alone would require a deposit of $175. Men were scarce at the time. Anderson & Corwin had a limited time to get out the timber. The value to them of hauling their bark would not be anywheres nearly equal to the expense they would be put to in making the change. The hauling of the railroad iron or changing the tracks would be of no benefit to them. If they needed advances they could ill afford to expend money on such a project as this. Mr. Phillips

was evidently aware that he was straining matters by insisting on their doing work. This is apparent from his remark, hereinbefore quoted, to the effect that he was doing everything he could 'to hold the logs.' His remark that * * * 'when I was at the back end of the spur with Mr. Russell, their foreman, he told me that'—is also significant. It is evident that he was aware of the danger of breaking the contract relations by insisting on this change. But he still persisted in his demand. Mr. Corwin wrote him on July 12th that '* *. * You said to the writer and our Mr. Russell that you would not accept our spur as we have it laid out,' and he nowhere in his subsequent correspondence denies this. Neither do I discover him to have denied it in his testimony at the trial. The letter of the 12th did not cause plaintiff to change its position. In answer to it in its letter of the 15th plaintiff wrote:

" 'We were dissatisfied with the way that you have put your spur track in, and why you should go ahead and lay it out without saying something to our Mr. Boyd, who you expect will have to run over it, is beyond our comprehension.'

"Again, in their letter of July 23d, Anderson & Corwin wrote—'We have gone to the expense of building this spur and you now claim you will not go on the spur unless we build a "wye" in connection therewith. This is another breach of the contract' and (although it apparently did not then know that Anderson & Corwin had resold the logs) it did not in its letter of August 4th deny that it had so refused. The written contract with the Spies-Thompson Company does not, as I read it, cover any specific logs and does not purport to be a contract of Anderson & Corwin but only of Anderson. It is at least questionable whether or not Anderson & Corwin had up to August 4th legally put it out of their power to complete the contract with plaintiff. It seems to me that it must be held that plaintiff positively refused to go in on the spur unless it was changed at considerable expense to the sellers; that such refusal was wrongful; and that its effect (whatever that is) was not changed by the fact that the plaintiff was inclined to compromise the matter by exchanging work and thereby reducing the expense to the sellers.

"What then is the legal effect of such refusal?   If the plaintiff had specifically refused to accept and pay for the logs the question would be clear.   Section 11896 *supra,* clearly grants to the seller the right to rescind under such circumstances.   And the rule was the same prior to the passage of that act.   *Hosmer* v. *Wilson,* 7 Mich. 304 (74 Am. Dec. 716) ; *Platt* v. *Brand,* 26 Mich. 175; *Wigent* v. *Marrs,* 130 Mich. 609.   But here plaintiff only refused to accept the spur.   Do the above quoted and similar authorities cover such a situation?   This depends, I think, upon the practical effect of the refusal.   And what was its practical effect?   Under the agreement the sellers were to cut and get out the logs and deck them at the track. They were to be scaled 'by competent scaler agreed upon by both parties while being put in the decks and after being so decked' were to become the property of the buyer.   They were to be 'decked in rollways along the C. M. & St. P., right-of-way   *   *   * or along a spur track which is to be put in' by the sellers.   The spur track which the sellers put in complied with the requirements of the contract.   As soon as the contract was made the sellers became entitled to whatever profits they could make, under the prices specified in the contract, by decking logs at this spur, without deduction of the cost of a passing track or the withdrawal of any of their hands from the logging operations for the purpose of putting in a wye or a passing track.   At the same time defendant [plaintiff] became bound to accept and pay for the logs when scaled and decked at such a spur.   The refusal to accept the spur, or go in on the spur, was, then, a refusal to consider the seller's accomplishments as a compliance on their part with the requirement of the contract.   It was a refusal on plaintiff's part to perform its part of the contract.   It was a demand on plaintiff's part that the sellers do more than the contract required them to, before it would do what the contract required it to do.   It was a demand that the contract be materially modified to the seller's detriment and to its material benefit, before it would accept and pay for the property covered by the contract.   It was, in substance

216—Mich.—7.

and effect, a refusal to perform its part of the contract as it existed, coupled with an implied offer to accept and pay for the property covered by the contract, if, but not unless, the sellers assumed material obligations which the original contract did not impose on them. If there is any difference between the refusal in question here and an absolute and positive refusal to accept and pay for goods ordered, it is one of degree and not of kind. I am constrained to hold that the refusal here in question amounted to a renunciation of the contract as made.

"Section 11896, 3 Comp. Laws 1915, provides:

"'Where the goods have not been delivered to the buyer, and the buyer has repudiated the contract to sell or sale, * * * the seller may totally rescind the contract or the sale by giving notice of his election to do so to the buyer.'

"In Anson on Contracts (2d Am. Ed.) pp. 368, 373, 374, it is said:

"'It is now settled that a renunciation of a contract by one of the parties before the time for performance has come, discharges the other, if he so choose. * * *

"'It may also happen that in the course of performance one of the parties may by word or act deliberately and avowedly refuse performance of his part. He may do this by renouncing the contract, or by rendering it impossible of performance. The other party is then exonerated from a continued performance of his promise.' * * *

"In *Hosmer* v. *Wilson*, 7 Mich. 305, in speaking of an anticipatory breach of contract by the defendant, the court said:

"'The defendants cannot complain that the plaintiff has given credit to their assertion. The law will not require a vain thing. And it is certainly, in such cases, much better for both parties to hold the party thus notified to be fully justified in stopping the work, as it lessens the damages the other party has to pay, and relieves the party who has to do the work from expending further labor, for which he has fair notice he is to expect no payment. And it is certainly very questionable whether the party thus notified has a right to go on after such notice, to increase the amount of his own damages.'

"In the case at bar it so happens that the sellers

profited by the resale of the commodity covered by the contract of sale. But this should not be permitted to lead us astray. Supposing there was no other market for the logs in question, that the wye or passing track demanded by the buyer would cost four times as much as it actually would, and that the buyer had (as plaintiff did here) plainly notified the seller that it would not act upon the assumption that the seller had performed his part of the contract unless the seller should construct the wye or passing track. Would it, under such circumstances, be fair or just to require the seller to go on and cut, haul and deck all those logs in the face of such notice that he need expect no pay therefor, except, perhaps, after a lengthy and expensive law suit? I think not. It would in my opinion be much more just to rule as was ruled in *Hosmer* v. *Wilson, supra,* that the refusal 'is to be considered in the same light * * * as an absolute, physical prevention' by the plaintiff.

"See, also, the cases cited in *Roehm* v. *Hurst,* 33 C. C. A. 550, 91 Fed. 345 (which is affirmed in 178 U. S. 1 [20 Sup. Ct. 780]).

"The language of the court in *Lake Shore, etc., R. Co.* v. *Richards,* 152 Ill. 59 (38 N. E. 773, 30 L. R. A. 33, 46, 47), in which the defendant misconstrued a contract, is apropos:

" 'The evidence tends to show that the defendant * * * manifested and declared its intention to persist in the future in the same course of conduct, and to insist upon the same construction of the contract. * * *

" 'The correspondence before referred to, as well as other facts shown, may be fairly said to show a fixed determination on the part of the defendant company * * * to persist in and continue the same breaches of its contract in the future of which it had theretofore been guilty,—that is, to pursue a course of conduct which would deprive plaintiff's firm of much the larger portion if not all, of the substantial benefits of the contract. * * * Such construction, in effect, was a repudiation of that part of the contract to be kept and performed by the defendant, and was a denial of the right of plaintiff to have and demand the substantial benefits of the contract as it existed between the parties.'

"It follows that a decree must be entered dissolving

the injunction heretofore issued herein and dismissing the bill and releasing the defendants from all liability under the contract of May 24, 1919.

"GEORGE O. DRISCOLL,

"Circuit Judge."

Counsel for appellant say:

"The trial court erred in finding that plaintiff breached the contract by refusing to proceed with its performance unless the defendants, Anderson & Corwin constructed a wye or passing track connecting its spur, neither of which was required under the terms of the contract.

"It is not claimed that there was any actual breach of the contract in question on this subject but only an anticipatory breach. The plaintiff contends that, under such circumstances, rescission could only be predicated upon an unconditional declaration, in positive terms, of an intention to abandon."

They also contend:

"The trial court erred in finding that plaintiff breached the contract by refusing to proceed with its performance unless defendants constructed a wye or passing track connecting its spur, neither of which was required under the terms of the contract."

In view of these contentions, even at the expense of prolixity it may be well to refer to the record again. A reference to the letter of June 13th will show an inquiry was made for the reason, "as next week will be time for further advances upon your contract."

June 16th a letter was sent in reply saying in part: "We did not understand that you expected we were going to make any report of logs decked until after the first of July." June 19th a reply was sent to this saying in part: "It is evident from your letter that you are not in need of additional money at this time, but the next $2,000 would be payable July 1st. Unless we hear from you to the contrary we will send you $2,000 at that time." June 24th a reply was sent to this letter saying in part: "Mr. Corwin

showed your letter to Mr. Anderson and he said the contract called for $2,000 to be paid by June 15th." A postscript was added: "Mr. Corwin hoped you would send check by return mail." The next day a reply was sent, saying in part: "We are enclosing our check for $2,000 as requested. We believe the contract states we were to pay $2,000 June 15th, providing you had that amount of logs decked at the railroad track."

There is not a suggestion in the letter that the $2,000 is not the June 15th advance, made as requested, and we have no doubt it was so intended and received. Either the plaintiff accepted the construction put upon the somewhat ambiguous language of the contract, or it waived the decking of the logs.

In the meantime a controversy arose about the spur track, and in a letter of June 19th the plaintiff said: "Unless you put in a connection from the north end and connect up with your present proposed track, forming a wye, we will have to refuse to go in there on account of the switching." No advance of $2,000 was made July 1st, and the letter of July 12th was sent by defendant. On July 15th plaintiff replied, saying in part:

"We have complied fully with our part of the contract and intend to do so in the future, and shall expect you to do so also. * * * The only thing for you to do is to get busy and live up to your contract, and if we have not complied with our part of it we are willing to leave it to the courts to decide."

At this time defendants had received but $4,000 in the way of advances, while they claimed that by the terms of the contract, as construed by the parties, they were entitled to $6,000 which they needed very much, and that one of the primary reasons for entering into the contract was the matter of the advances, which facts were well known to the plaintiff.

The last letter is not an intimation that if plaintiff has not complied with its part of the contract it is willing to do so, but it is a plain intimation that a law suit is brewing. We think the chancellor was justified in his conclusions, but if there is doubt about the reasons given by him for his conclusion there is another phase of the case that should have attention.

Counsel for the appellees have insisted all the time that even if there is a breach of the contract the issue should be tried upon the law side of the court and not before the equity side. Counsel for appellant invoke relief in equity because

"(*a*) That the logs in question were so located that the plaintiff could use its loading machinery, men and locomotives stationed at Tolfree in the loading of such logs. That this consideration was highly important to plaintiff because in this way it controlled the flow of logs from the loading points to its mill. That such control is a very great advantage to it as thus it can keep its mill in operation at times when, if the loading were under the jurisdiction of a contractor, such contractor might see fit to load and ship the logs at times when the plaintiff would not require them, or neglect to load at times when it was imperative that plaintiff have logs delivered to its mill in order to keep it in continuous operation.

"(*b*) That it was exceedingly difficult at that time for plaintiff to purchase such logs as those contracted for by the defendants, Anderson & Corwin, and particularly under like conditions.

"(*c*) That if plaintiff's mill were closed down by reason of failure to operate the same, it would be impossible to establish the actual damages caused thereby and it would seriously affect large numbers of employees of plaintiff.

"(*d*) That the logs contracted to be sold were of the character desired by plaintiff for its manufacturing operations, the same containing, among other things a very high percentage of hemlock which the plaintiff particularly desired.

"(*e*) That there is no regular market for logs of the kind in question at the place in question, each

manufacturer who does not do its own logging, negotiating with various logging contractors for given cuts.

"(*f*) That the terms of the contract were such that it would be impossible to establish the measure of damages resulting from a breach thereof, as for example, the contract called for several varieties of logs at different prices and until these logs should be cut and scaled there would be no way of establishing the exact amount of logs of each kind."

They cite in support of this contention a number of authorities and among them *White Marble Lime Co.* v. *Lumber Co.*, 205 Mich. 634. A reference to these authorities will show them readily distinguishable from the instant case.

In the opinion written by Justice STONE in the last named authority it appears:

"This contract was the reason for, and basis of, the organization of the plaintiff corporation. Pursuant to the plans and agreements of the parties, the Chicago Lumbering Company paid for half of the stock of the plaintiff, which was issued to the stockholders of the lumbering company *pro rata*, who in that way subsequently received their share of all the profits made by the plaintiff company. Relying upon this contract the plaintiff built a large and expensive plant at Manistique and has developed a large business."

In the case before us the plaintiff had been a going concern for a long time. There is nothing to indicate its status was changed any more because of the making of this logging contract than it would have been by the purchase of any other 3,000,000 feet of logs.

Counsel for appellant say at the end of their brief:

"The dismissal of the bill was followed by the use of the logs by the Spies-Thompson Lumber Company, so that specific performance is now impossible.

"It is submitted however, that the plaintiff ought not to be obliged to institute a new action for relief and that the proceeding should be remanded to the trial court for assessment of plaintiff's damages."

If testimony is available upon which an equitable assessment of damages can be made it is difficult to see why it would not be available in an assessment of damages on the law side of the court.

The language used by Justice STEERE in *Toles* v. *Duplex Power Car Co.*, 202 Mich. at page 230, is very germane here. The case is so recent and so available that we content ourselves by thus referring to it. See, also, *Blanchard* v. *Railroad Co.*, 31 Mich. 43.

The decree is affirmed, with costs to the appellees.

STEERE, C. J., and WIEST, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.